No. 27.—John G. Winter, plaintiff in error, *vs.* Seaborn Jones, defendant in error..

[1.] This Court has authority to decide upon the constitutionality of an Act of the Legislature.

[2.] The objection to a law, on the ground that it impairs the obligation of a contract, does not depend upon the extent of the change which the law may make in it.

[3.] Any deviation from its terms, by imposing conditions not expressed in

the contract, however minute, and apparently immaterial in their effect, is within this constitutional prohibition.

[4.] A contract entered into between the State and an individual, is as fully protected by this prohibition, as a contract between two individuals.

[5.] A constitutional Act of the Legislature is equivalent to a contract, and when performed, is a contract *executed;* and whatever right; are thereby created, a subsequent Legislature cannot impair.

[6.] Courts have nothing to do with the wisdom, policy, or expediency of a law. These are matters purely of legislative deliberation and cognizance.

[7.] It is the duty of Courts, to put such a construction upon Statutes, if possible, as to uphold them and carry them into effect.

[8.] By the Common Law, unless there is an express agreement to the contrary, the cost of the conveyance falls upon the vendee of land.

[9.] A warrant and survey of land, and payment of the price, gives to the purchaser a *legal* right of entry, sufficient to maintain ejectment.

[10.] A patent or grant, is only necessary to ascertain that all the pre-requisites of the law have been complied with.

[11.] The only distinction between a legal and an equitable title, consists in the payment, or non-payment, of the purchase money.

[12.] In case of sales of land by the State, under an Act of the Legislature, the *law* gives the right, and the grant is to be considered, not as *title*, but the *evidence* by which it is shown, that the pre-requisites have been complied with.

[13.] A purchaser of land from the State, by the act of *entry and payment*, acquires an inchoate legal title, which may descend, be aliened or divested, in the same manner as any other legal title.

[14.] The holder of a certificate who has paid for the land, is indefeasibly entitled to a grant, which the certificate and the law imperatively command to be issued.

[15.] A purchaser who has paid for his land, and holds a certificate or receipt from the agents of the State to that effect, acquires a title sufficient to enable him not only to protect his possession, but to arrest any intruder, by due course of law.

[16.] Every presumption is in favor of a grant.

[17.] In general, a Court of Equity is the tribunal best adapted to try the validity of a grant.

[18.] Where the State has no title to the thing granted, or where the Governor had no authority to issue the grant, in such cases, the defect appearing on its face, the grant is absolutely void, and may be impeached collaterally in a Court of Law, in an action of ejectment.

[19.] A grant, purporting on its face to be issued by virtue of an unconstitutional law, is void, and can convey no title.

[20.] Where the fraud complained of does not appear on the face of the grant, but arises on circumstances, *dehors* the grant, the grant is voidable only by suit, and cannot be impeached collaterally by parol proof.

Ejectment, in Muscogee Superior Court.    Tried before Judge IVERSON, May Term, 1851.

This suit was brought by Jones, to recover fractional lot, (No. 10,) in 7th district of Muscogee.   The plaintiff claimed under a grant issued in 1849, to him as purchaser, under a sale authorized by the Act of 1847, entitled "an Act to authorize the Governor to appoint fit and proper persons to sell and dispose of the undrawn lots in the Land Lotteries heretofore had in this State, and to limit the time for fraction purchasers to pay for, and to take out grants for fractions."   For Act, see *New Dig.* *p.* 709.   It was agreed that Winter was in possession, and the rent was worth $600 ; that the fraction was sold in 1828, and purchased by Seaborn Jones, Esq. for $1500, and all of the instalments paid previous to the sale of reverted fractions, in 1834 ; that Jones transferred the certificate to Ingersoll, who conveyed to Winter, prior to the passage of the Act of December, 1847.

Defendant then offered to prove by the Sheriff who sold the land under the Act of 1847, " that he did not give the tenant in possession, nor Winter, who lived in Columbus, notice of the intended sale ; and that Mansfield Torrence, who was interested with plaintiff in said purchase, before said sale, requested him (the Sheriff) not to give said notice.   Also, that the Governor had given Gen. James N. Bethune, who was agent for the State to superintend said sale, instructions to suspend the sale of any fraction where the owner or holder of the certificate would come forward at any time before the sale, and furnish evidence that he had paid up all the purchase money, and pay the said agent the grant fee."

Plaintiff having objected to the evidence, it was rejected by the Court.   This is the first error assigned.

Defendant's counsel requested the Court to charge, that the 2d and 3d sections of the Act of 1847 were void, because they

contravene that article in the Constitution, inhibiting the passage of an Act containing matter variant from what is expressed in the title. The Court declined so to charge, and this is the next ground of error assigned.

Defendant's counsel requested the Court also to charge, that the Act of 1847, so far as it provides for the forfeiture and sale of the fractional lot purchased and paid for by defendant, on the sole ground that he had failed to take out a grant, was void, because it is repugnant to the 16th section I. Article of the Constitution of the United States, which provides, " that no State shall pass any *ex post facto* law, or law impairing the obligation of a contract." The Court declined so to charge, and this is the next ground of error assigned.

H. HOLT, for plaintiff in error.

H. L. BENNING, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This is an action of ejectment, for fraction No. 10, in the 7th district of Muscogee County, purchased originally at the sales in 1828, under the provisions of the Act of 22d December, 1827. Seaborn Jones, the defendant in error, became the purchaser, for the sum of $1550; received a certificate, in accordance with the provisions of said Act, and transferred the same to one Stephen W. Ingersoll. The whole purchase money was paid, prior to the passage of the Act of 1834, for the sale of reverted fractions; and the certificate of said sale, with all the instalments duly paid thereon, became legally vested in John G. Winter, plaintiff in error, by sundry *mesne* conveyances.

Subsequent to that time, to wit: in December, 1847, an Act was passed, by which said fraction was declared, under certain conditions, forfeited to the State, and ordered to be re-sold. It was sold, and Seaborn Jones, the defendant in error, again became the purchaser, and instituted this suit to recover possession of the premises, together with the *mesne* profits; and a judg-

ment was rendered for the same in his favor, in the Superior Court of Muscogee County.

At the trial, counsel for the defendant below requested the Court, among other things, to charge the Jury, that the Act of 1847, so far as it provides for the forfeiture and re-sale of the fractional lot in dispute, on the ground that the purchaser had failed to take out the grant, was void, because repugnant to the 10th section of the 1st Article of the Constitution of the United States, which declares, that " no State shall pass any law impairing the obligation of contracts," which request was refused. And to this ruling, counsel for John G. Winter excepted, and filed his writ of error to this Court. The only question which I propose to discuss is, the alleged repugnance of the Act of 1847, to the Constitution.

[1.] The power of the Judiciary to pronounce against the validity of those laws which contravene the Constitution, however delicate and embarrassing in their exercise, has ceased to be a debatable question in the Courts of the Union. At an early period this power was denied, on the ground that the Judiciary being at most, but a co-ordinate branch of the government, they could not defeat or control the Legislative will, by vacating laws, of the constitutionality of which, one department had no better right to judge than the other.

But the conclusion to which the whole country has come, with a concurrence of opinion and unanimity of sentiment, which leaves no room to doubt its correctness is, that the Constitution is the permanent law of the land; and that all legislative acts which impugn its provisions, are not merely voidable, but absolutely void. That the question was between conflicting laws, one of which must give way and the other stand ; and the whole point was, whether the Court, who could execute but one of the laws, had a right to decide whether there was a conflict, and which should yield ? That the Judiciary owe a duty to the Constitution above that which they owe to the Legislature, and that when one says one thing and the other a contrary thing, they must obey the *Constitution*, which is in effect, deciding against the *law*.

Winter *vs.* Jones.

The same section of the Constitution which restrains the individual States from passing any law impairing the obligation of contracts, prohibits them also, from passing any bill of attainder, *ex post facto* law, from making any thing but gold or other coin a tender in payment of debts, or granting any title of nobility.

Suppose, what I admit is not very likely to happen, that the Legislature should pass an Act of *Attainder*, against an obnoxious citizen, for treason, or making cotton, or any other thing but gold and silver, a lawful tender ; or conferring the title of Marquis or Duke upon some one, for meritorious services rendered the public? Will it be pretended that the Courts could be compellable to execute such laws, against the plain meaning and express words of the Constitution ? No one, I apprehend, having a proper sense of the obligations of an oath, will contend for, or defend such a doctrine ! It carries the highest degree of impiety, as well as absurdity, upon its face ! True, these are strong cases ; but the manner or degree in which these constitutional inhibitions are violated, can make no difference. See 1 *Tuck. Black. appendix*, 293, 355.

While, therefore, I shall always feel it to be both my duty and pleasure fairly and patiently to compare legislative Acts, with both the State and Federal Constitutions, and if possible, to reconcile the one with the other, yet, when fully satisfied in my judgment and conscience, that they violate these paramount laws which I have sworn to support, I shall not hesitate to adjudge them nugatory, regardless of the consequences; deriving consolation from the conviction that I have faithfully performed my duty, and that the people will sooner or later do me justice.

Assuming it as a principle, then, that a case may occur, where it may become the duty of the Judiciary to declare a Statute of the State contrary to the Constitution, and where they may be called upon to arrest its execution, we are led to inquire whether the Act in question is of this character ?

[2.] All the commentators, and all the adjudicated cases upon Constitutional Law, agree in these fundamental propositions : That the objection to a law, on the ground of its impairing the

obligation of a contract, does not depend upon the extent of the change which the law may make in it.

[3.] That any deviation from its terms, *by imposing conditions not expressed in the contract*, however minute and apparently immaterial in their effect, is within this constitutional prohibition.

[4.] Moreover, it is well settled, that a contract entered into between the State and an individual, is as fully protected by this prohibition, as a contract between two individuals ; that the contracting parties, whoever they may be, stand in this respect, upon the same ground ; that the obligations imposed, and the rights acquired by virtue of the contract, cannot be impaired by a legislative Act.

[5.] That a constitutional Act of the Legislature, which is equivalent to a contract when performed, is a contract *executed*, and whatever rights are thereby created, a subsequent Legislature cannot impair. *Smith's Com. on Con. Law, p.* 382, 385. *Story on Con. U. S.* §§1379, 1385. 1 *Kent's Com.* §19, *p.* 388. *Green vs. Biddle,* 8 *Wheat.* 1, 84. *Fletcher vs. Peck,* 6 *Cranch,* 87, 135. *Trustees of the Bishop's Fund vs. Riden,* 13 *Day's R.* 87. *New Jersey vs. Wilson,* 7 *Cranch,* 164. *Tarvett vs. Taylor,* 9 *Ibid,* 43. *Sturges vs. Crowingshield,* 4 *Wheat. R.* 122. *Dartmouth College vs. Woodward,* 4 *Wheat. R.* 518. *Atwater vs. Woodbridge,* 6 *Conn. R.* 223. *Osborne vs. Humphry,* 7 *Conn. R.* 736. *The Derby Turnpike Co. vs. Parks,* 10 *Conn.* 522. *Landon vs. Litchfield,* 11 *Ibid,* 257. *The People vs. Platt,* 17 *Johns. R.* 195.

Let us test the Act under review by these principles.

The Legislature, at its session in 1827, passed an Act to dispose of the residue of the lands before that time reserved for the State. The 1st, 2d, and 3d sections, provide for the appointment and qualification of the commissioners, who were to carry the law into effect, the surveying of the land, &c. By the 4th section it is enacted, " That the highest bidder for any fraction or fractions, lot or lots of land or islands, authorized to be sold by the Act, shall be the purchaser, who shall pay to the commissioners aforesaid, one-fifth of the purchase money in specie, or current bills of any chartered bank of the State ; on

the payment of which, the said commissioners, or a majority of them, shall give to such purchaser a certificate, stating the amount paid, and the amount of said purchase money then due, and to be paid in four equal instalments."

Section 5th enacts, " That any purchaser failing to pay any instalment to the Treasurer, within sixty days after the same becomes due, shall forfeit the amount paid, and said lands shall revert to, and become the property of the State."

By the 6th section it is farther enacted, " That when the last instalment is paid, according to the face of the certificate given by the commissioners, it shall be the duty of the Governor to cause a grant or grants to be made out in the name of the holder of said certificate, agreeably to the laws then in force regulating grants, which said grant shall be given to the holder of said certificate or certificates, on his or her paying the sum of $4,50 into the treasury of this State, for office fees." *Dawson's Com.* 267.

The certificate given by the commissioners in pursuance of the 4th section of this Act, stated the amount paid on each fraction, and the amount of purchase money due, and to be paid in five annual instalments, with the condition or clause of forfeiture, on failure to pay each instalment within sixty days after they severally became due. And this is the whole contract between the State and the purchaser. The State on her part, reserves the right to reclaim the land on the non-payment of any part of the price, and to retain the money already paid; and she obliges herself to make out a grant so soon as the last instalment is paid, and deliver it to the purchaser or his assignee, upon the payment of $4,50, the office fees, the remuneration fixed for executing a title.

The purchaser on his part, obliges himself to pay a certain sum for the land, in five instalments, and consents to forfeit the land, together with the payments already made, should he fail to pay either of the instalments as required by the Act and the certificate issued by the commissioners, by the direction thereof. The purchaser agrees to pay $4,50 for the grant, before he is entitled to receive the same.

And this is all that can be contended for, even if the 6th section is embodied in the contract, and considered as constituting a part thereof. But counsel for plaintiff in error have insisted, and we think it difficult to answer the argument, that the 4th and 5th sections of the Act, and the certificate executed conformably thereto, stating the terms of purchase and the mode of payment, with the forfeiture annexed, contains all of the contract; and that the 6th section is merely directory to the Governor, to deliver a grant to the holder of the certificate, (whenever he shall wish to have his title evidenced by a grant,) upon payment of the office fees.

Such, then, is the contract made by the parties in 1828, under the Act of 1827; and it is conceded, that the contract cannot be enlarged or abridged, or saddled with conditions not expressed in the contract, except by mutual consent of both parties to the agreement; and that any law having this tendency, is unconstitutional and a nullity. Does not the Act of 1847 have this effect? Is it not obnoxious to this objection?

It limits the time of taking out the grant, until the first day of November next ensuing its passage, and imposes as a penalty for non-compliance, a forfeiture of the land. Are there any such terms or conditions as these expressed in the contract? Is it not silent upon this subject? It provides expressly, that a failure to make punctual payments shall work a forfeiture. Is it not strange and unaccountable, that the neglect or omission to take out a grant, should be made now to produce the same result, when neither the law nor the certificate included any such provision? If one cause of forfeiture is expressly provided for, is not the inference strong and irresistible, that all others are excluded, especially when the cause of forfeiture sought to be lugged in, is of a different character and description altogether, from those which are enumerated?

Was it left out through neglect, or forgetfulness? This can hardly be supposed, when the attention of the Legislature was directed to the very subject of what should, or should not, work a forfeiture of the property purchased.

Winter *vs.* Jones.

Our conclusion is, that there was no such intention in the minds of either of the contracting parties. It was certainly not the understanding of the vendee, or after paying $1550 for the fraction, he surely would not have permitted this valuable interest to revert to the State, by withholding the pittance exacted for the grant; and the character of the State for justice and liberality, forbids that any such design should be imputed to her.

How broad the difference between this class of cases, and that where the purchaser has .failed to pay the amount of the purchase money; and notwithstanding there are some expressions in the Act of 1847, which would seem to apply to both, yet for myself, I cannot resist the belief, that it was not so understood or intended by the General Assembly. I infer this, not merely from the manifest wrong which such a measure would inflict upon the purchaser, who had promptly fufilled his engagement to the public, but from the words of the Act itself. It is " to authorize the Governor to appoint fit and proper persons, to sell and dispose of the *undrawn lots,* in the land lotteries heretofore had in this State; and to limit the time for fraction purchasers *to pay for,* and take out grants for fractions."

Who would suppose, whatever may be the strict grammatical construction of this language, that it was designed to embrace purchasers of fractions, who had already paid the *whole* purchase money? So much for the title. Again, the 1st section provides, " that all persons who have purchased fractional lots in this State, under the laws *requiring* them to take out grants for said purchases, shall have until the first day of November next thereafter, to take out their grants."

But what law is there " *requiring* " purchasers who have paid up the whole amount of purchase money, to take out grants? The Act of 1827 makes no such requisition, much less does it declare a forfeiture on failure to do this. No time is prescribed even, within which grants are to issue. It only enacts, that when the instalments are all paid, *agreeably to the certificate* given by the commissioners, that it shall be the duty of the Governor to cause grants to issue, and to be *delivered* to the holder of the certificate, upon the payment of the office fees.

I will not be guilty of the disrespect of saying, that there has been any misconception or perversion of the intention of the law-making power, in the practical interpretation which has been given to the Act of 1847; but reposing, as I do, the utmost confidence in the wisdom and justice of the representatives of the people, I entertain no doubt whatever, that upon a re-examination of the question, they will repudiate any such intention, as that which has been ascribed to this Act, and solemnly affirm the view which we take of it.

[6.] I am aware, that with the wisdom, sound policy and expediency of a law, the Courts have nothing to do. These are matters purely of legislative deliberation and cognizance.

[7.] Still, before determining that the Constitution has been plainly and palpably infracted, incautiously or otherwise, by a co-ordinate branch of the government, the best energies of our minds should be employed in putting such construction upon it as to uphold it if possible, and carry it into effect, *ut res majis valeat quam pereat.*

Be this as it may, however, for myself, I can never consent that the omission to take out a grant in this case, within the time limited by the Act of 1847, or within any other period, by a purchaser who has paid up the whole amount of the purchase money, shall work a forfeiture of the property, there being no such condition, expressed or implied, in the original contract of sale between him and the State. That fractions which were bought and not paid for, should revert to and again become the property of the State, is perfectly right, for such was the *bargain* between the State and the citizen; and that it was entirely competent for the Legislature to make such disposition of this portion of the public domain, as is provided for in the Act of 1847, there can be no doubt. And that *drawn lots,* where the fortunate drawer failed to take out his grant, as in *Brinsfield vs. Carter,* (2 *Geo. R.* 143,) should be subject to like disposition, it is equally clear. For these, too, by the terms of the contract, the person drawing " and failing to take out his grant within two years from the date of the draw, forfeited his right to receive a

Winter *vs.* Jones.

grant to the land so drawn, and the same reverted to the State."
*Dawson's Compilation*, 256.

. But could any two cases be more distinguishable in principle,
than *Brinsfield and Carter* and *Winter and Jones?* Besides, in
lottery lands, the $18 was not the office fee, neither was it the
price of the grant. It was a revenue provision. It was the
whole consideration received by the State when she parted with her
title to the property. The mere drawing did not vest the right.
It clothed the drawer with the pre-emption right of purchasing
the land at $18, on a credit of two years.

[8.] But in the case before the Court, the purchase money,
$1550, was the consideration received by the State, for parting with
her right of property in the fraction ; and the $4,50 grant fee, was
the price fixed upon, which the purchaser should pay for his
title ; an expense which, without any stipulation, would have fal-
len upon him by the course of Common Law, in cases between
individuals. For, unless there is an express agreement to the
contrary, the cost of the conveyance falls upon the purchaser.
*Sug. on Vend.* 296. And it would be monstrous to maintain
that the insertion of a clause in the Act of 1827, which the law
would have implied without it, should operate so prejudicially to
the purchaser. The maxim is *expressio corum quæ tacite insunt
nihil operatur.*

. Believing then, as we do, that this contract, made between the
legally authorized agents of the State and the purchaser of this
fraction, in conformity with the Act of 1827, is under the pro-
tection of the 10th section and 1st article of the Constitution of
the United States ; and that the Act of 1847, if it warranted the
subsequent sale made under it of this fraction, because the grant
had not been taken out, impairs the obligation of this contract
by superadding a condition or clause of forfeiture not contained
therein, we feel ourselves bound to declare it invalid, and to
award a judgment to the plaintiff in error.

And here we might leave the case. It may not be amiss,
however, to inquire what is the nature and extent of Winter's
title.

[9.] In the case of *Sims' lessee, vs. Irvine,* (3 *Dall.* 425,) this doctrine was elaborately considered. The question to be determined was, whether a warrant and survey *and payment of the consideration,* gives a legal right of entry, sufficient to maintain an ejectment? Counsel in the negative insisted that a *patent* was essential to the title of the plaintiff; that until that issued, the terms of the bargain were not settled, *nor had the proprietors parted with the fee;* that it was a paradox to maintain that the *legal estate* could exist in the *proprietors* and the purchaser, at the same time.

[10.] But the Court held that a warrant and survey, *where no money remained to be paid,* had uniformly been deemed a *legal* title, as opposed to an *equitable* one; and had all the consequences as such, even as to dower, which was conclusive as to its being a *legal* title, there being no dower of an *equitable* estate; *and that a patent was only necessary to ascertain that all previous requisites had been complied with.*

[11.] In the lessee of *Penns vs. Klyne,* (1 *Wash. C. C. Rep.* 20,) the Court say, " the plaintiff has no patent, but yet, by the Common Law of this State, a warrant and survey, *if the consideration be paid,* gives a legal title against the *proprietary,* as much so as if the patent had been granted. If the consideration be not paid, then the legal title is not out of the proprietary; but still, the warrant holder has an equitable title, which he may render a legal one, by paying what is due to the proprietary." See also, the *Lessee of Copely vs. Biddle,* (2 *Wash. C. C. Rep.* 354,) to the same point. *Carson's lessee vs. Boudinot* 2 *Ibid,* 33; and the *Lessee of Vanhorn vs. Chesnut,* (*Ibid,* 160,) draw the same distinction between a legal and an equitable title, which consists in the payment or non-payment of the purchase money to the State, and affirm by implication, the same doctrine.

In Kentucky, in the case of *Thomas vs. Marshall,* (*Hardin's R.* 19,) it was held, that this was an inchoate legal title, and might be aliened and sold under execution. And in *Shearer vs. Clay,* (1 *Litt.* 260,) the Supreme Court of that State held, that neither the delivery nor the acceptance by the grantee of a patent is necessary to the consummation of title.

Winter *vs.* Jones.

[12.] This question has been frequently before the Courts of
Alabama, and in *Goodlet vs. Smithson*, (5 *Porter's R.* 245,) was
examined at some length. This was an action of *trespass* to try
titles. The plaintiff relied upon a Sheriff's deed, and proposed
to show by proof, that the land he claimed had been entered by
the defendant in execution, in the land office of the Coosa land
district, previous to the Sheriff's levy upon it ; *and that full pay-
ment had been made by the defendant,* who had secured the certifi-
cate thereof, in due form of law. The Circuit Court charged
the Jury on the trial, that previous to the issuing of a patent, the
purchaser of land from the United States had no such title there-
in as was subject to levy and sale. Goodlet having failed in his
suit, prosecuted a writ of error to reverse the judgment rendered
against him and assigned for error in the Supreme Court, the
instructions before stated.

And after argument, the appellate tribunal held, *that in cases
of sales made by the government, the law gives the right,* and the
patent may be considered, not as the title itself, but as the evi-
dence by which it is shown, that the pre-requisites of a legal ti-
tle have been complied with.

[13.] That the act of purchase transfers an immediate right of
possession ; and that the title thus acquired, is sufficient to en-
able the purchaser to arrest an intruder by due course of law ;
and that the certificate which was required to be given until the
patent could issue, *where the money was all paid,* was evidence
*that the purchase was complete ;* and that by act of entry and
payment of the purchase money, the purchaser of land from the
United States, (and I add, from each of the individual States,)
acquires an inchoate legal title, which would descend and might
be aliened or sold under execution, as any other legal title.

[14.] The same Court, in *Bullock vs. Wilson*, (2 *Porter's Rep.*
436,) decided two years earlier, expressed an opinion upon the
*grade* of interest or title, indicated by a paper like that held by
Winter. They say, that by the laws of the United States, the
legal and *bona fide* holder of a receipt or certificate of this kind,
*is indefeasibly entitled to a patent,* (and so we say, that John G.
Winter is *indefeasibly* entitled to a grant, that is, has a right to

one, which no power under heaven can *defeat,* annul, or abrogate.) Nothing more is necessary on his part to secure it. He already has a legal right. *The receipt and the law imperatively command the issuing of the patent,* or the complete evidence of the title; and until this is done, the receipt for the purchase money is the best evidence of the right, which the nature of the case admits of.

[15.] And while the Chief Justice, in delivering the opinion of the Court, admits that a paper title like this, is fully within the equity of the Statute passed in that State in 1812, (*Aik. Dig.* 283,) still he did not consider *receipts* of this nature, as requiring the aid of any Staute. For that, upon the principles of the Common Law, they must be regarded as evidence of a grade of title,, which at least confers the right of possession; and this alone is sufficient to maintain trespass. But the Judge held. that it was more; that it was nothing less than inchoate evidence of an absolute title.

The case of *Masters vs. Eastis,* (3 *Porter's R.* 363,) is not considered at variance with the principle decided in these cases. And if it was, it was virtually overruled by *Goodlet and Smithson,* which was decided twelve months after it. Judge *Goldthwaite,* in referring to the case of *Masters vs. Eastis,* supposes that the judgment was predicated upon some defect in the *mesne* conveyances, the certificate having been probably assigned by mere indorsement, which would not pass the title. For that while it was ruled that the grantee of the United States must succeed against the assignee of a certificate, which had previously been held by the grantee, and which he had assigned to him, yet, the Court directly and explicitly recognize the principle, that if a conveyance had been made by *deed,* the title of the grantee by the patent, would have inured to the defendant in that action.

The case of *Masters vs. Eastis,* therefore, is a direct authority in favor of Winter, so far as the main principle involved in this controversy is concerned; for it concedes that where the certificate has been transferred to the present holder, so as to pass the property, nothing remains in the State but the naked legal

title; that whenever the grant issues, it inures to the benefit of the *bona fide* holder.

And this Court, in accordance with this current of authority, which might be greatly multiplied, ruled, in *Pitts vs. Bullard*, (2 *Geo. Rep.* 10,) that where the vendee has paid for the land, he has such a legal estate as subjects it to levy and sale under an execution at law; and that no conveyance was necessary to vest in the purchaser the legal estate.

So in this case, the State retained nothing but the naked title, and this she held as trustee for the purchaser; and this was all the Legislature could dispose of.

But it is argued that Winter had not paid the $4,50 grant fee. I have endeavored to show, that under the Act of 1827, this was no part of the purchase money or consideration for the land. The State did not so understand it; for the purchase money was divided into five instalments, and the grant fee was a separate and distinct matter, and provided for in a separate and distinct section of the Statute. It was to remunerate the officers of the government for their personal labor in preparing the title, and is so stated in the Act itself.

But it is not necessary to this case, to establish that Winter held such an estate in this fraction, as would subject it to sale under a Common Law *fi. fa.* It is enough, that under the contract, a right had vested in him to have the grant made out upon the payment of $4,50, the only condition prefixed to its delivery. And there was no time limited within which the application was to be made, but it was left entirely to the option and convenience of the purchaser. And to attempt, under these circumstances, to deprive a citizen of his land for omitting to apply for a grant within ten months from the date of the Act, is a procedure at war with the whole policy and practice of the State, from its organization down to the present period.

But is it competent for a Court of Law to go behind the grant, and examine into the authority upon which it was issued?

Whatever doubts may have arisen at one time in England on this question, and whatever conflict of opinion may have existed

in the different State Courts respecting it, there can be none at this day, in this country.

[16.] It is true that every presumption is in favor of a grant. That every pre-requisite has been performed, is an inference properly deducible from the fact, that it is the act of the highest officer of the State, and performed in the execution of a function prescribed by law, and requiring the exercise of judgment and discretion. It would, therefore, be extremely unreasonable, to void a grant in any Court for irregularities in the conduct of those who are appointed by the government, to supervise the progressive course of a title, from its commencement to its consummation in a grant. But there are some things so essential to the validity of the contract, that the great principles of justice and of law would be violated, did there not exist a tribunal to which an injured party might appeal, and in which the validity of the grant might be examined. *Polk's lessee vs. Wendell et al.* 9 *Cranch,* 87.

[17.] In general, a Court of Equity appears to be a tribunal better adapted to this object, than a Court of Law.

[18.] But there are cases where a grant is absolutely void, as where the State has no title to the thing granted; or where the officer had no authority to issue the grant. In such cases, the validity of the grant is necessarily examinable at law. *Ibid.*

Says Chief Justice *Kent,* in *Jackson vs. Lawton,* (10 *Johns. R.* 23,) "If the elder patent in the present case was issued by mistake, or upon false suggestions, it is voidable only; and unless letters patent are absolutely void on the face of them, or the issuing of them was without authority, or was prohibited by Statute, they can only be avoided in a regular course of pleading, in which, the precise irregularity or mistake, is directly put in issue."

And in *Patterson vs. Winn,* (11 *Wheat. Rep.* 380,) the Supreme Court say: " We may, therefore, assume as the settled doctrine of this Court, that if a patent is absolutely void upon its face, or the issuing thereof was without authority, or prohibited by Statute, or the State had no title, it may be impeached collaterally in a Court of Law, in an action of ejectment. But in

general, other objections and defects complained of, must be put in issue in a regular course of proceeding to avoid the patent."

The practice which has always prevailed in the Courts of Georgia, so far as we have any information upon the subject, is in accordance with the rule here laid down.

[19.] Now, the grant in this case, under which Jones, the plaintiff in ejectment, claims, purports upon its face to be issued by virtue of the Act of 1847, and the Executive order founded thereon. But if that Act is unconstitutional, then there is no authority for issuing this grant; and of course the grant itself is void, and it is within the province of a Court of Law to pronounce upon its invalidity. If an Act, deriving its authority from a supposed law, should come before the Court, there could be no doubt, I presume, of the Court's power to defeat the Act, if the law was found not to exist. And such precisely is the case where an Act is founded upon a law repugnant to the Constitution. The antagonism being ascertained, it is not law; it loses at once the vital efficacy of a law.

Not only is this grant, therefore, void upon its face for want of authority, but it is also void because the State did not own the fraction at the time the grant issued, and consequently, could convey no title to it.

[20.] It is unnecessary, perhaps, to express any opinion upon the facts admitted upon the record in this case, but which are *dehors* the grant. It appears that the agent of the State, Gen. James N. Bethune, was in Columbus up to day of sale, and at the sale, with instructions to suspend the sale of any fraction, where the owner or holder of the certificate, would come forward and furnish evidence that the purchase money had been paid, and pay the grant fee; that no notice was given to John G. Winter, the owner of the fraction, who resided in Columbus, or to the tenant in possession of the land; and that Mansfield Torrence, who was interested with Col. Jones in purchasing this fraction, requested the officer to withhold the notice.

In a bill filed on the Equity side of the Court, I am inclined to think that a Jury would feel themselves warranted upon this

testimony, in setting aside this grant by their decree, as having been fraudulently obtained.   It was a fraud upon the State, in diminishing the public revenue, by preventing competition at the sale ; and it was a fraud upon the party, by keeping him in ignorance of his peril; whereas, by receiving the notice required by the law, it would have enabled him timely to have interposed to protect his property, and save himself the expense and trouble of this litigation.

Upon the whole, therefore, without pursuing this investigation any farther, and without deciding upon the other points of law made by the bill of exceptions, we are unanimously of the opinion, that upon the ground alone, that the grant to Seaborn Jones is void in law, the judgment of the Circuit Court must be reversed.

Few cases, if any, have been argued more forcibly and eloquently by counsel on both sides, than this ; and I beg leave to tender my special acknowledgements to R. J. Moses, Esq. for the brief which he has furnished.   It is simple, concise and nervous ; alike remarkable for the distinctness with which he presented his case, the perspicuity of its analogies, and the accuracy with which his legal references were made to sustain it.