## LINTON, tax-collector, *v.* LUCY COBB INSTITUTE.

1. Under the constitution productive property is taxable, even though the income be used for charitable or educational purposes. But buildings used as a college may be exempt from taxation, even if in the operation of the institution income is derived from tuition fees.

2. Tuition is a charge made for instruction, rather than as rent for the use of the buildings in which the instruction is imparted.

3. Prior to the adoption of the constitution of 1877 "all buildings erected for and used as a college, incorporated academy, or other seminary of learning" were exempt from taxation, although students were charged for attendance.

4. The same language was incorporated in the constitution of 1877, and was intended to continue the right of the legislature to preserve existing exemptions, and the proviso that "the property so exempted be not used for purposes of private or corporate profit or income" was not intended to destroy the exemption already granted where incidental income was derived from the operation of the charitable or educational institution.

5. Neither before nor since the present constitution was a tax exemption lost by reason of the fact that tuition fees were charged, where the fees themselves were not used for the purpose of private or corporate profit or income, but were appropriated to the maintenance of the institution.

6. This ruling is supported by the contemporaneous, uniform, and long-continued construction of the constitution by all taxing officers, and has been acquiesced in by the legislative department of the government.

7. The property sought to be taxed was donated and used solely for educational purposes. There was no capital stock, there were no dividends, and the owners received no profit therefrom. All the receipts were devoted exclusively to the pay of teachers, the maintenance of the institution, and the repair of the buildings. The injunction was properly granted to restrain the levy of the tax fi. fa. SIMMONS, C. J., dissenting.

Submitted March 23,— Decided June 25, 1903.

Injunction. Before Judge Russell. Clarke superior court. November 14, 1902.

*C. H. Brand, solicitor-general,* for plaintiff in error.
*Erwin & Erwin,* contra.

LAMAR, J.   This case involves the question whether Lucy Cobb Institute loses its exemption from taxation under the Political Code, § 762, because of the fact that it collects a tuition fee from its students.   In 1857 the citizens of Athens subscribed to a fund which was subsequently used in the purchase of the present property.   These subscriptions were entered on a book still kept, but beyond that no stock or other evidence of ownership was ever issued, and the subscribers have never at any time exercised any control of the school.   In 1859 some of these subscribers and their successors were incorporated under the name of "The Lucy Cobb Institute," with authority "to hold property and do acts necessary for educational purposes." Land was bought, buildings were erected, and the school was organized and successfully conducted until 1882, when George I. Seney donated $10,000, which with other subscriptions was used for the erection of a chapel and commencement hall on the land of the institute.   A successful college has since been conducted, and is now in operation.   The record shows that nothing in the nature of dividends has ever been declared; that all receipts from tuition or otherwise are appropriated exclusively to the maintenance of the school and its buildings; and that the property is in no manner used for corporate or individual income or profit, nor has any corporate or individual income been derived, but that the entire property and receipts are devoted solely and directly to the carrying on of the school.   It does appear, however, that tuition fees are charged those in attendance on the college.   It is claimed that even though the property as a college building would ordinarily be exempt, it is subject to taxes, because tuition is charged; and the ruling in *Mundy* v. *Van Hoose*, 104 *Ga.* 292, is cited in support of that contention.   That case was undoubtedly rightly decided.   The property there involved had once belonged to an educational corporation, but had been by it conveyed by warranty deed to Van Hoose and Pearce, and was in use by them as a source of personal income and support.   They lived on the premises with their families; part of the land was used for farming purposes; a small house was rented to tenants; and the main buildings were used for giving exhibitions for which charges were made.   In these buildings they conducted a boarding-school, and all of the income and profit went to the private owners' individual and personal use. There was nothing to indicate that the property had been dedicated

to public purposes. It was an educational business enterprise. What was said in the *Mundy* case as to the effect of tuition being charged was therefore undoubtedly correct as applied to any property in use for private or corporate gain, and where the fees and other earnings were appropriated to the personal and individual support of the owners of the land. That ruling does not affect a case like this, where the facts are so entirely different,—where there is no private ownership, no capital stock, no surplus, no dividends, and where the collections from the operation of the college are applied solely to maintaining the institution and repairing its buildings. Using the word "charity" in the broad sense of the Civil Code, § 4008, if such collections destroy the exemption every charity in the State is taxable. Such a construction affects every church building, every hospital, every orphan asylum, every library, every eleemosynary institution in Georgia. The effect of the decision in the *Mundy* case has given rise to so much controversy and doubt as to the meaning of the constitution, the issue is so important, and the consequences of our decision so far-reaching, as to justify, if not require, a full discussion of the questions involved.

In pursuance of the power conferred by the constitution, Civil Code, § 5884, the legislature (Acts of 1878-9, p. 33, Political Code, § 762) enacted: "The following described property shall be exempt from taxation, to wit: All public property, places of religious worship, and places of burial; all institutions of purely public charity; all buildings erected for and used as a college, incorporated academy, or other seminary of learning; the real and personal estate of any public library, and that of any other literary association, used by or connected with such library; all books, philosophical apparatus, paintings, and statuary of any company or association, kept in a public hall, and not held as merchandise or for purposes of sale or gain: *Provided,* the above-described property so exempted be not used for purposes of private or corporate profit or income." There is no room to apply the rule as to strict construction; for the exemption of college buildings is clear and unequivocal. The only question which can arise is whether the grant made at the beginning of the clause was taken away at the end,—whether the exemption expressly allowed was nullified by the proviso. Long-continued and universally recognized canons of construction admit of but one answer. So far as we can learn, this is the first attempt

in Georgia to tax a college building used solely for educational pur-
poses.    If it had ever before been attempted, the act of 1850 (Acts
1849-50, p. 379) exempted from taxation all property of colleges;
and when the convention met in 1877, the Code of 1873, § 798,
exempted "All buildings erected for and used as a college, incor-
porated academy, or other seminary of learning."    This language
was copied literally into the constitution of 1877.    To relieve col-
lege buildings is therefore no new thing, no departure from ancient
usage, but the continuance of an old and well-established public
policy; and when to the clause specifying what might be exempt
the convention added, "provided, the property so exempted be not
used for purposes of private or corporate profit or income," there was
no intent to enact new law or to depart from ancient policy.    There
was no purpose to make the grant ridiculous and ineffective, but
only to guard against the perversion of a liberality extended by
every State in the republic.    The exemption was in recognition of
the fact that these buildings had been set apart for a special pur-
pose, dear to the heart of the State.    Her sons and daughters had
of their private means given funds to erect these seats of learning.
The buildings were not for gain or barter, but for an unselfish and
noble public use.    It was almost inconceivable, that, having been
in effect given to the public, the public would ignore if not repu-
diate the generosity, and actually tax the gift by imposing an annual
burden on property solemnly dedicated to the cause of education.

    In construing statutes it is the duty of the court above all else
to give effect to the intent of the lawmaking power.    That must
be discovered primarily from the language used; but words and in-
tent are not always the same, and hence the constant necessity for
applying the rule which forbids a severe literalism at the sacrifice
of the spirit.    This is particularly applicable to constitutions which
are necessarily comprehensive and free from the details into which
statutes more properly enter.    Verbal niceties are to be ignored, for
the controlling question is, what did the convention intend?    To
answer that inquiry the view must be wide, the condition and his-
tory of the times be examined, the past policy and the present pur-
pose of the body towards those institutions considered.    Was it
friendly or adverse?    Was a new policy to be inaugurated, or the
old continued?    If there be apparent inconsistency, incongruity, or
conflict, the constitution must be so construed as to let its provi-

sions be operative, rather than self-destructive.    Let the construction be such as to give effect rather than nullify.    Ut res magis valeat quam pereat.    The contention of plaintiff in error would make the grant of exemption absolutely inoperative.    To construe the proviso as is here sought would be to make a solemn provision without a subject-matter on which to be operative; for in 1877 there was not within the borders of the State a hospital, library, college, academy, seminary, or church which was in a position to accept the intended and proffered bounty.    Then, as now, not a college in Georgia was able to give free tuition.    To say that the convention meant the exemption only for those institutions which might be conducted free of charge was to say that it granted a privilege which no one could claim; that it sought the cheap and ignoble reputation of offering what no one could take; that in order to gain the advantage of an exemption these institutions had to sacrifice the greater for the less — surrender tuition fees, their main source of support, to secure the smaller exemption, and in effect should be forced to cut down the tree to gather the fruit.    That such was not the intention of the people is manifest from the construction put upon the constitution by those who immediately began to carry its provisions into effect.    From that day to this no comptroller, no tax-receiver, no tax-collector, no sheriff, no officer of any department of the government so construed its provisions.    The contemporaneous, uniform, uninterrupted construction of people and officials has been that buildings used for college purposes were exempt even though tuition was charged those who sat therein and learned. Such construction is weighty even in doubtful cases — long continued it is controlling.    The exemption was not absolute.    The legislature was authorized to grant, but not obliged to do so.    In any tax act since 1878 the subjects enumerated in the Civil Code, § 5884, could have been taxed like any other property, and the General Assembly in acquiescing in the non-enforcement of taxes against these institutions, added its voice in approval of the practical construction thus given to the constitution.    If contemporaneous construction was ever entitled to weight, that given this section merits the gravest and profoundest consideration.

It is apparent from the history of the times, and the language used, that the convention was continuing the former exemption to the same class of property and under the same conditions on which

they had previously claimed and received this benefit. It was not creating a new scheme of exemption, or fixing new terms, or requiring the institutions as a condition precedent to surrender the right to collect fees, charges, or collections absolutely essential to the maintenance of the quasi-public institutions. But aside from this view, the very language of the constitution requires us to hold in conformity to the long-continued practice. The proviso that "the property so exempted be not used for purposes of private or corporate profit or income" means what it says. The buildings of a college are not used for corporate gain. The fees paid by students are not in the nature of rent for the use of the building. These fees are for instruction — for the time, labor, skill, and learning of professors. Buildings, apparatus, desks, blackboards, are necessary, but incidental, and nothing approaching a rent charge is made of those who gather in the halls to listen to the living voice of the teacher. It is for what he imparts that the student pays, and the fact that he teaches in a building is not to put the building to the purpose of corporate gain. The buildings are used for educational purposes, but not for purposes of profit; and such a use was never regarded by the convention as that which would nullify the express grant previously given. There is hardly a hospital in which some charge is not made for food, nursing, and medical attention of those able to pay ; but it is for those things, rather than for the use of the building, that payment is made. The contention of plaintiff in error would impose a tax upon all cemeteries ; for as new graves are dug and new sections conveyed some charge is imposed, or else for care of the mound beneath which rests the human dust. Bearing in mind the definition of "public corporation" in the Civil Code, § 1833, the logic of the position would force a tax upon the State University and all its branch colleges ; and the contention here would impose a tax upon every library that collects a fee for books read, and upon every church building in which pews are rented or collections taken. No such scheme was intended. The convention was pursuing the old policy with a new proviso, devised to prevent perversion of the State's liberality. The generous exemption was to the institutions, buildings, and appliances used for educational, charitable, or religious purposes. It was not to be forfeited by incidental collections from pew rent, tuition, hospital fees, all of which were to be at once put

back into the stream of charity to continue the work in an endless circle of benevolence.

Rent is compensation paid for the use of real estate.   In a sense the owner who uses it pays rent for his own property, and in book-keeping would charge himself what he could get from another.   In that sense a charitable corporation might be said to pay rent for the use by itself of its own buildings, even where it made no charge against those who were the beneficiaries of the charity.   But no one would claim that such use of its own buildings would bring the property within the proviso, or make such use the earning of profit.   Nor would it be different, so far as the earning of rent is concerned, if, instead of making no charge against the inmates, fees should be required for services rendered or food supplied.   The charges against the beneficiaries would not be for the use of real estate as such, but in consideration of tuition, clothing, food, or serv-ice.   This certainly would be true where the amount of such col-lections did not exceed the cost of maintenance, and left no sur-plus.   Property used for raising income is not exempt, although the income may be used for charitable purposes; but property used for charitable purposes is not taxable, although in the operation of the charity incidental income may be derived.   Upon analysis such will be found to be the law previously declared by this court, and by others under statutes and constitutions substantially like our own.   In the case of *Trustees* v. *Bohler*, 80 *Ga.* 159, the court was considering the question as to whether income-producing land held by the trustees of a poor-house was taxable, and Chief Justice Bleck-ley said (p. 163) : " It may be thought the produce of a pauper farm, connected with an alms-house, would come within the terms ʻ profit or income,ʼ and so they would, perhaps, as to any surplus over and above the consumption of the inmates and others attached to the establishment; but the main purpose being to furnish employment to the paupers, and supply them with subsistence at the seat of the institution, the element of profit or income would be altogether sec-ondary and incidental.   The property, therefore, would not be used for profit or income in the same sense as if it were farmed or rented out, and not used at all by the inmates, but by others paying for its use as productive capital.   The scheme of exemption as to other than public property seems to be this :  to exempt all that is used immediately and directly as a part of the establishment in the con-

duct of the regular business there carried on, but not such as may be devoted to other uses, such as farming, merchandising, manufacturing, etc., and from which profit or income is derived. It is the use of the property which renders it exempt or non-exempt, not the use of the income derived from it."

In Yale University v. New Haven, 71 Conn. 316, the court held that the fees of students, whether apportioned as room-rent or tuition, could not be treated as income from real estate. The sum paid for the use of the room does not alter the character of the occupation. "A church is none the less a church because the worshippers contribute to the support of services by way of pew rent. A hospital is none the less a hospital because the beneficiaries contribute something towards its maintenance. And a college is none the less a college because its beneficiaries share the cost of maintenance; and it is immaterial whether such contribution is lumped in one sum, or apportioned to sources of expense, as tuition, room-rent, lecture-fee, dining-hall, etc." p. 328. The constitution of Pennsylvania provides that the General Assembly may exempt from taxation "actual places of religious worship, . . and institutions of purely public charity." It was held in County of Northampton v. Lafayette College, 128 Pa. St. 132, that the institution did not lose its character as a purely public charity because tuition was charged in order to make the school self-sustaining. Some of the pupils paid full rate, some half rate, and some nothing. The tuition with the income from gifts paid the expenses, but the buildings were used exclusively for school purposes, and were exempt from taxation. In Philadelphia v. Women's Christian Assn., 125 Pa. St. 572, the exemption was not lost nor was its character as a charity destroyed "if to some extent it receive a revenue from the recipients of its bounty." There was no stock in the association, no element of gain in its object or operation; and the mere fact that it charges a small sum to a portion of those who feed at its table and enjoy the shelter of its roof does not destroy its character as a purely public charity. Nor does a camp-ground lose its exemption as a public charity from the fact that it makes charges for the use of its privileges. Davis v. Camp Meeting Assn., 57 Ohio, 257. In Sisters v. Township of Chatham, 52 N. J. L. 373, the corporation did not lose its exemption as a public charity, where some of the scholars were educated gratuitously and the money derived from

tuition was appropriated to the support of those who administered to the sick.    See also State *v.* Powell, 74 Mo. 476 ; Trustees *v.* Louisville, 100 Ky. 470.    What was said as to competition in the *Van Hoose* case, supra, and in *Massenburg* v. *Grand Lodge*, 81 *Ga.* 212, related to property held for gain, for when property held by a charity and used for the purpose of raising income is brought into competition with other productive property it must be taxed ; but it is only to that class of competition that these decisions refer.    A free school competes more vigorously and destructively than one where tuition is charged.    But confessedly the constitution does not require the imposition of a tax where nothing is collected, nor does the educational institution lose its exemption when the competition becomes less acute because charges are made and the receipts are at once appropriated to the continued support of the public charity.    At the time of the adoption of the constitution it was a mooted question as to whether an exemption allowed certain classes of property would continue if the same was diverted to another use. *Mayor of Savannah* v. *Solomon's Lodge*, 53 *Ga.* 93.    The proviso in the Civil Code, § 5884, was no doubt intended to settle this question by extending the exemption only so long as the property was used for the quasi-public purpose.    Whenever it was used for profit or income, it lost the exemption which was granted so long as it was devoted to charitable, religious, or educational purposes.

The effect of charging tuition fees is the real matter in issue. The immediate party to the cause is the Lucy Cobb Institute, but its right is infinitesimal by comparison with the public interests at stake, under which taxation not only for the future, but back taxes are involved.    We have therefore mainly dealt with this controlling and far-reaching proposition, but must not let the rights of the individual be lost sight of in the greater public issue involved.    For many years the trustees were the active managers of the institution, collected the fees, and paid the salaries and other expenses. . That not being altogether satisfactory, a new arrangement was made with the principal.    The written contract is not in the record ; but it appears that she became the active manager, made the collections, paid the expenses, and appropriated a certain amount to the repair of the buildings, and the balance was her compensation. Whether this be called a lease, a working contract, an agency, or what not, the legal effect was the same.    The school, it seems, was

conducted in the name of the institution, diplomas were given under its charter, and the buildings were used for educational purposes, and not for income. The property was given, donated for college use proper, as in Englewood v. Chamberlain, 55 N. J. L. 292, 294, where a schoolhouse duly incorporated was turned over to a teacher under an agreement that a certain per cent. of the entire income should be paid to liquidate the interest of a mortgage, pay insurance, taxes, and other expenses of this nature, the balance to be applied by the teacher to the expenses of running the school and to pay for his own services. It was held that this property was not subject to taxation under a statute exempting schoolhouses " provided that no building so used, which may be rented for such purposes and rent received by the owner thereof, shall be exempted."

The record is very meager, and it may be that this institution has property which is taxable. If so, that can be shown on the final hearing; but in view of the positive allegation and the uncontradicted proof the court rightly granted the injunction against the tax fi. fa. as levied; and the judgment is

*Affirmed. All the Justices concur, except Simmons, C. J., who dissents.*

CANDLER, J., concurring specially. I concur in the foregoing opinion of Mr. Justice Lamar. It is to me incredible that the members of the convention of 1877 who framed the constitution, or the people who adopted that instrument, intended to strike down all the colleges of the commonwealth, other than those owned and maintained by the State, as must have been the case if any such burden of taxation had been laid upon them at that time as is now claimed. The enlightened policy of the State had been, not only to exempt from taxation the buildings and grounds of these institutions, but to exempt their endowments also; and this had been true without regard to what political party was in power. The party which held the reins of government in the days of reconstruction did not for a moment consider the reversal of this time-honored policy. There was no popular demand, or indeed a demand of any sort, for the reversal of this wise policy, before the constitutional convention of 1877 was assembled, nor pending its proceedings, nor after its adjournment, when the constitution was submitted to the people for ratification. It may well be doubted if

any considerable number of persons dreamed that by any possible construction of the proposed constitution Georgia's policy in this particular was changed, and for it an embargo on enlightenment had been substituted; and it may also be doubted whether the constitution would have been approved by the people if they had thought any such construction possible.     Any property held for educational purposes is exempted from taxation in Virginia, West Virginia, North Carolina, South Carolina, Tennessee, Alabama, and Florida; and it may well be questioned if the people of Georgia ever intended to depart from this generous policy so characteristic of the Southern States of the American Union.     The exemption of all the property of these institutions is worth more to the State than its taxation, and the discouragement to benevolence towards them which arises from their taxation is an injury to the State which the revenue derived from them can by no means offset.     Out of the treasury of the State appropriations are made for the promotion of higher education, all the people of every class, whether sharing the benefits of such education or not, being forced by the taxing power to contribute to the funds from which these appropriations are drawn.     Is it credible that after forcing an involuntary contribution from all the people for the promotion of higher learning, the State would discourage voluntary contributions to the same cause from the same people?  Is it reasonable to suppose that with one hand the State would build up education while with the other it would pull the cause down?  Or, will any man dare contend that the State seeks to single out for discouragement by the exercise of the taxing power the educational institutions of the churches, from which the commonwealth has derived and does derive such inestimable blessings?  Would Georgia mulct the Christian churches for their efforts to enlighten the people?     It is incredible.     I regret that the language of the constitution seems to require the taxation of endowments; but surely the grounds and buildings immediately used in the work of instruction can not be included in this requirement, if indeed it was ever intended that endowments invested exclusively for the public benefit, and not for private gain, should be subject to taxation in this State.

By an act approved February 21, 1850, it was provided that all "colleges in this State shall be exempt from taxation, and shall be upon the same footing with the University of Georgia." That statute

shows the State as the impartial and consistent patron of higher education, and forbids the idea that the commonwealth would by taxation discourage or persecute any benevolent body which should seek to enlighten the youth of the land without wish or hope of gain and without charge upon the treasury of the State.    The spirit of that act still prevails, and should be allowed to have its weight where it is not controlled by the constitution of 1877; and with reference to the taxation of the grounds and buildings of the colleges of this State the constitution follows the words of the act.

So believing, I am glad to concur in a judgment which refuses to hold liable for taxation the buildings and grounds of the Lucy Cobb Institute, an institution of learning bearing an honored and beloved name, and having a long record of the most blessed service to the daughters of Georgia and the South.    The benevolence of the lamented Thomas R. R. Cobb, and the later gift of the philanthropic citizen of New York to more perfectly equip it for service, are properties which Georgia has put beyond the tithing touch of the tax-gatherer, and these sacred offerings should be securely held as long as Georgia possesses a spark of interest in human enlightenment or a particle of gratitude for patriotic benevolence.

SIMMONS, C. J., dissenting.   The record disclosing that the buildings were used for purposes of income, this case is controlled in principle by that of *Mundy* v. *Van Hoose*, 104 *Ga.* 292, and other decisions of this court which are therein cited.