CITY OF ATLANTA *v.* OGLETHORPE UNIVERSITY.

No. 9761.   FEBRUARY 14, 1934.

*J. L. Mayson, C. S. Winn,* and *J. C. Savage,* for plaintiff in error. *Watkins, Asbill & Watkins,* contra.

BECK, P. J.   Oglethorpe University filed its petition against City of Atlanta, seeking an injunction against a prosecution of said university or its agents by the City of Atlanta or its agents for and on account of a business license which the city claims the university was under obligation to pay to the city.   The university alleged that it was an incorporated college of learning under the laws of the State, without capital stock, and conducting a broadcasting station from a point in the City of Atlanta, as a part of its educational work; that a license had been issued to the university by the Federal Radio Commission to operate its broadcasting at a point in the city; that the university uses the broadcasting station to extend university training beyond the campus, and religious teaching at appropriate times; that this did not require the use of the instruments of the station at all times, and therefore that commercial broadcasting was possible, and that this was undertaken by the university, charging compensation therefor.   The petitioner also alleged that it was an agency of the Federal Government and transmits educational, religious, and commercial broadcasting to points without the State of Georgia.   It does not know what proportion, but alleges that this was done, and that therefore it was engaged in interstate commerce.   The petition sets out the charter power of the city to tax occupations and businesses, and following this an ordinance which requires persons operating businesses to register their place of business; and following these general au-

thorities it appears that an ordinance was passed putting a business license on radio broadcasting stations of $300 per annum, and the City of Atlanta called on the university to pay the same. It is alleged that a tax fi. fa. was issued for one fourth of the amount of the license, and the city authorities were threatening to levy same; and furthermore, that unless enjoined, the employees of the university would be arrested under the tax ordinance referred to, and cases made against them in the police court, and they would be subject to fine. The petitioner alleges that this business license which the City of Atlanta was undertaking to collect violated the laws and constitution of the State of Georgia, which exempts colleges from the payment of taxes; that the work which it was doing was interstate commerce; that such an act would deprive it of its privileges and immunities without due process of law, as it was operating as a governmental agency; that the enforcement of the tax fi. fa. would interfere with its business and its work as a college; and that it was without remedy at law.

The city filed a demurrer, and an answer wherein certain of the allegations of the petition were admitted and others denied. It denied that the broadcasting station was a mere incident to the educational work of the university, and alleged that the station in question, WJTL, was operating as any other broadcasting station. It alleged that charges were made for services rendered, and so far as this broadcasting station was concerned, when the charter of the plaintiff was amended, to authorize it to operate this broadcasting station, this broadcasting station was described as a "business" to be carried on by the university. The city denied that the broadcasting station was maintained for educational and benevolent purposes, but alleged that broadcasting was to be carried on as a business; that the local station operated by the university makes contracts for broadcasting various products of various businesses; that all the transmission by WJTL was done through the Atlanta station and through the transmitter located there. The city denied that this was in any sense interstate commerce, but insisted that the business was subject to tax just like any other business.

After hearing evidence the court granted the injunction as prayed, and the city excepted.

■ We are of the opinion that the court erred in granting this injunction. The city's contention that this broadcasting station

was carried on just as any other broadcasting station was sustained by the uncontroverted evidence in this case. Charges were made for broadcasting advertising, and messages in the nature of advertising were interspersed with songs, music, and other entertaining features; and the evidence showed that it had contracts with various concerns for broadcasting. The testimony of David H. Brinkmoeller, manager of the station WJTL, and an employee of Oglethorpe University, was in part as follows: "I am manager of radio station WJTL division of Oglethorpe University. The office is at Oglethorpe University. My office is there, too. We have no business office in Atlanta. There is just a studio at the shrine mosque that we broadcast from; it consists of a transmitter, studio, and microphone; we have a control place; we have a broadcasting station at Lupton Hall, Oglethorpe; we broadcast from shrine mosque; also in position to broadcast from St. Luke's Episcopal Church. The studio at the mosque is not an office; it is just a place for musicians to come and go and put on their programs. It is just a room, not as large as this. As to whether we rent the room for this purpose, that is arranged through the shrine mosque. There is a transmitter, a tower, microphone, and 'speech-in-put' equipment there. We have a room where the orchestra can play into the microphone and from that room where it is transmitted by this machine to the air. Whether we have singers there, or anything else, it is broadcasted in the same room. My first duty as manager of that radio station is to see that the personnel complies with all rules of the Federal Radio Commission; we also have to see that the programs are presented properly. I am not on a salary. I get a certain percentage of the receipts of the radio station. Sometimes I get 25 per cent.; sometimes lower. That depends on the amount of money we have to spend for salesmen, not on the character of contract. We make contracts for advertisements over this radio. Radio advertising rates are different; for instance, there is a difference between daytime and nighttime rates; there is a charge for fifteen minute programs; a charge for half-hour; charge for full hour; in addition, there is an announcement charge, day or night. These advertising contracts are where we play music a while, then announce the business advertised, play some more, announce again, just standard announcing. We have contracts now with Pedigree Dairies, John S. Florence Motor Co., Withers Coal Co.; there may

be more; we have one or two little announcements. We took the marathon dance purely on the basis of being public interest. They pay a little for it; not enough to pay the cost. I would say our average income per month from commercial contracts to the station is about $700 per month; $500 to $700. We have no fifteen-minute contracts now with speakers, like political speakers; there were no fifteen-minute programs sold during the last political campaign. We had one announcement, I think, from Mr. Etheridge, which was paid for. Our musical programs, entertaining programs, are not put on to secure advertisements; we have quite a few programs that will not permit any sponsorship, though people have tried to buy them. The university station is an educational station, licensed by the government. We are forced to maintain a prestige all the time through our radio station; have to be very particular about the programs presented; although we try to get as much revenue as possible, revenue is not the first thing."

There was evidence to show that the income was $500 to $700 per month; also evidence to show that the station was operated at a loss. There was also testimony to show that by far the greater portion of the time was given to educational and free programs. There was evidence to show that the primary business of the station was educational. Brinkmoeller testified further: "The primary business of this station is educational; about 95 per cent. of time is given to educational and free programs. As to what percentage of the total expense of the station the $500 to $700 returned from commercial programs covers, the gross expenses of the station are about $2,000 per month. These students, who are announcers and engineers, get a partial scholarship; anybody that works on the station gets a partial scholarship. That is partially for the purpose of educating them in radio work. They have organized a radio school out there, and by giving a partial scholarship they are helping them go through school, and giving them actual experience in radio station and radio transmission work." There was other testimony showing the amounts received from the business, and evidence showing that a large part of the time was devoted to educational purposes. But in view of all this evidence, giving full force and effect to the testimony of Brinkmoeller, we think that the broadcasting station and its activities amounted to a business. It received business just as other broadcasting stations would do. It might refuse

certain classes of advertising, but legitimate and proper advertising matter was received, and other messages were transmitted just as any other broadcasting station. And the city was authorized, under its charter and ordinances in question here, to fix a license fee and exact payment of the same. It does not appear that the amount of license fee, $300, was unreasonable or confiscatory. The fact that the broadcasting station in question did not make a profit from its operation, but suffered a loss, does not determine the question. And we do not think that this business was exempt from taxation under the constitutional provisions authorizing the exemption from taxation of educational institutions (art. 7, sec. 2, par. 2; Code, § 6554), nor under our statutes making effective the provisions of the constitution referred to. The case of *Linton* v. *Lucy Cobb Institute,* 117 *Ga.* 678 (45 S. E. 53), may be differentiated on its facts. But in connection with that case, read also *Mundy* v. *Van Hoose,* 104 *Ga.* 292 (30 S. E. 783).

█ It is claimed by the petitioner that its broadcasting business is interstate, in that some of its messages may go beyond the State line. Even if it is true that some of its messages do go beyond the State lines, that does not make it interstate business, especially as there is nothing in the evidence to show that it has received or will receive messages to be transmitted beyond the State lines into other States. But even if it did receive such contracts, its business is certainly almost altogether intrastate; and its income is derived almost entirely, if not altogether, from what might be called intrastate business. In *Smith* v. *Clark,* 122 *Ga.* 528 (50 S. E. 480), the petitioner claimed to be free from a license charge, on the ground that he was engaged in interstate commerce; but it was said in that decision: "Smith, as an agent of a packing-house, was engaged at the same time in two classes of business, one taxable and the other non-taxable. The State statute could not operate to impose a tax upon him for the interstate business, and the interstate clause of the constitution of the United States did not operate to relieve him from liability for tax on the intrastate business. On this branch of the case, allegations of the petition were substantially the same as those passed upon in *Kehrer* v. *Stewart,* 117 *Ga.* 969 [44 S. E. 854], 25 Sup. Ct. R. 403. It affirmatively appears that meats stored in the warehouse in Augusta were sold in large quantities to customers in Georgia. This was intrastate business, and when he engaged

384

therein Smith . . could not relieve himself of this liability because he also sold goods to customers in South Carolina."

■ The ruling made in the third headnote requires no elaboration.

*Judgment reversed. All the Justices concur, except Russell, C. J., who dissents.*

ON MOTION FOR REHEARING.

The motion for rehearing is denied, but the trial judge is directed to pass such order as may be necessary to preserve the status until final judgment in the trial court.