Ruffin, C. J.
 

 In deciding on this appeal it is to be borne in mind, that the question did not arise on the hearing of the Cause, whether there should be a perpetual injunction ; but the question is, merely, whether the injunction shall be continued to the hearing.
 

 . It is a doctrine of the common law, that if a ferry be erected so near an ancient ferry on the same stream as to draw away its custom, it is a nuisance to the owner of the old one, 3 Black. 219. And it was held by this court in the case of
 
 Long
 
 v.
 
 Beard and Merrill,
 
 3 Mur. 57, that in such a case
 
 *619
 
 an action lies for the owner of the first ferry, against the owner of the new one, although the latter be a free ferry; for the injury to the plaintiff was not in the gains of the defendant, but in drawing away the travel and thereby diminishing his tolls and the value of his franchise. The reason for this, as given by Mr. Blackstone, is, that the owner of a ferry is bound to the public to heep it in repair and readiness for the ease of the citizens; and that he cannot do, if his franchise may be invaded or if the income of the ferry may be curtailed by diverting passengers by means of a rival unauthbrised establishment of a like kind. Therefore, although the public convenience is the occasion of granting franchises of this nature, and, for example, the ferry established, or the road chartered, is
 
 publici juris,
 
 yet the property is private ; and, consequently, an injury to it may be the subject of an action. For, no person could be expected to serve the public by bestowing his time, labor} and money in establishing a ferry or erecting a bridge, if its value could be immediately destroyed by the caprice or malice of private persons in adopting means of drawing away the custom to'some establishment of their own. It is, then, truly the interest of the public, as well as an instance of the private justice due to an individual, that the public grant of franchises of this kind should be protected by being held to be exclusive in the grantee, unless legally and duly ordered otherwise by the public authorities, Hence, not only did the common law give redress for an invasion of the franchise of a ferry by an action : but upon its being found that such redress was not adequate, equity interposed the more effectual remedy and restraint of injunction. It is obvious, that, from the difficulty of proving the extent of the injury from time to time, and from the constant litigation arising out of the repeated invasions of the right, that must, be naturally expected from a rival erection, the relief in equity is highly salutary, and, indeed, is the only remedy that has any pretensions to be deemed adequate. The cases are numerous of redress in that method. In a case in the Exchequer, Loup Hale presiding, the owner of land on both sides of the Thames set up a ferry
 
 *620
 
 > three quarters of a mile from an ancient ferry, and there was a decree to suppress it on the bill of the owner of the old ferry. 2 Austruth, 608. The doctrine has, indeed,been extendeq aq exclusive grants or franchises, of which one is in the actual possession, and there is no fair doubt of his title.—
 
 Bush
 
 v.
 
 Western,
 
 Pre. Ch. 530.
 
 Whitchurch
 
 v.
 
 Hide, 2
 
 Atk. 391.
 
 Croton Turnpike
 
 v.
 
 Ryder,
 
 1 John. C. C. 611.—
 
 Newburg Turnpike
 
 v.
 
 Miller, 5
 
 John, C. C. 101. The same principle was acted on in this State in the case of
 
 Long
 
 v.
 
 Beard,
 
 No. Ca. T. R. 256. It is true,
 
 that there the
 
 defendants received pay and therein expressly violated the statute; but the relief would have been granted without that circumstance, upon the general principles stated in the latter part of the opinion. And, in the case of
 
 btewburg Turnpike
 
 v.
 
 Miller,
 
 the remedy,by injunction was used to suppress a free bridge, in a case like the present, We consider, then, the law of the case quite well fettled. The only questions, further, are, whether the plaintiff is entitled to the franchise, of which he is in possession
 
 j
 
 and whether the defendant has shown any right to disturb the plaintiff or divert his custom.
 

 It is true, the plaintiff .doth not show ,an express grant to himself or even to any one, u;nder whom he claims, to keep a ferry over the French Broad. But by the acts of 1779 and 1784, the power to appoint and settle ferries and to rate them, js conferred'on the County Courts ; and, therefore, the rating ,of Sams’ ferry in 1801, can be no less, by implication, than ithe settling it then, or, at the least an admission that it had been ¡before done by some order not now found; for as the appoint, ing and the ratbag are legally-to be the acts of the same body^ .the rating a ferry, as then existing, imports that it thus existed by leave of that court, and, therefore, legally existed. Then .the bill states, that, from that day to this, Sams, Jarrett, or the plaintiff has, in succession been in the uninterrupted possession, under that grant and subsequent conveyances. The an, swers admit the possessions as charged, and they do not deny the grant-nor the mesne conveyances, but say only, that the defendants have no knowledge nor belief on those points — .
 
 *621
 
 But an injunction cannot be dissolved on an answer of that kind; which barely hesitates to admit the plaintiff’s title, and will not venture to deny it. We have said, indeed, that we consider the grant of the ferry, originally, sufficiently established by inference from the recognition of it by the County Court. But if there were any doubt of that, the subsequent exclusive and notorious enjoyment for forty-four years places ■the title above all question, if the different possessors have been in on the same title. As to Sams and Jarrett, it explicitly appears to have been so ; lor the deed of the former to the latter expressly conveys the ferry. As far as we can collect from the description in the deed of Jarrett to the plaintiff, the land conveyed includes that on which the ferry was established, which, if that be true, passed with the land. The plaintiff swears, that such is the feet. It is probably so, judging from the admissions in the answers, that from the date of that deed Jarrett left, and the plaintiff has been in possession. It may be necessary, perhaps, on the hearing, that the plaintiff-should establish this point more distinctly, as he may do by a survey and other means. But as he has had no opportunity yet to take proofs, and the motion
 
 to
 
 dissolve the injunction is heard on the pleadings and exhibits alone, and the answers do not deny the title, we must assume for the present, after so long a possession, under apparent color, that the plaintiff’s title is good, especially as the County Court has also in 1834 rated the bridge built by the plaintiff in lieu of the ferry, therein calling the plaintiff (he owner. It is next to be observed, in order that it may be understood thatthe right to the ferry gives the plaintiff the right to the bridge and to demand tolls at it, that the act of 1806, Rev. St. c. 104, s. 28, expressly authorises the proprietor of a ferry, who shall prefer building a good bridge, instead of keeping the ferry, to do so, under the same right and in the same manner by which the ferry is held, with a proviso, that the tolls may be regulated by the County Court, so that a greater advance on the tolls above the ferriages than ,25 per cent, be not allowed.
 

 It is further to be considered, whether the defendants have
 
 *622
 
 shewn any right in themselves, to encroach on that of the plaintiff by drawing away travel to another ferry or bridge. They allege such right upon several grounds: First, they say, t¡lat pave ,the privilege of making themselves useful to .their fellow-citizens by the donation of a bridge, that may be passed without toll; and that even then the plaintiff’s tolls will not be diminished more than about one-half, and that the income will still__.be a'fair remuneration for his outlay on the bridge. This pretension has been already considered in discussing the grounds, on which both law and equity give a remedy to the proprietor of a franchise like the plaintiff’s. The case of
 
 Newhurg Turnpike and Miller,
 
 was that of a free bridge, and it was put down. So, in
 
 Long
 
 v.
 
 Beard,
 
 3 Mur. 57, the ferry was laid in one count to be free, and the judgment was affirmed ; and to the argument, that such a ferry was for the public good, it was replied that the public could think nothing for its good, which was an injury to an individual by ruining his property. Private persons may dedicate their land or other property to the public use ; but not so .as to impair and injure exclusive rights previously granted by the public to a citizen. To authorise such an interference they must shew not only their own willingness to promote the convenience of the community, but the acceptance thereof by the regular organs of the public, the constituted authorities. Without such sanction, the action of individuals is not only officious, but must be deemed to be opposed to the will of those authorities, the true public, in a legal sense. For the making and regulating roads, ferries, and bridges, are the proper subjects of political action, and are necessarily governed by the will of the law making power, or of those to whonuit may be delegated. In such a case as this, authority to erect a new bridge might well be refused,, upon the grounds of the gross injustice to the plaintiff, who had already laid out his capital for the accommodation of the public, upon the good faith of the public. Besides, although the defendants might be willing to build a bridge at present, what security is there, that they would keep it up ? The immediate effect of their bridge
 
 *623
 
 is to render the plaintiff’s too unprofitable to be worth his care, and it goes down. When the new bridge decays, the plaintiff or any other person cannot be expected to trust the public faith so far as to build another toll bridge, which may hgain be rendered of no value by a rival free bridge, and the defendants will be under no obligation to rebuild their bridge; and thus the charge will be thrown directly on the public or county treasury, or the public, will be without a bridge'altogether. The truest policy, therefore, as well as good faith to the plaintiff, might forbid the County Court from granting the defendants an order for their bridge; and we must take it, that the defendants so understood, else they would have applied for an order. Fot it cannot be doubted, that in our law the whole subject of ferries and bridges is under the control of the several County Courts. From the nature of the subject.- the necessity for a new ferry or bridge is, like that for a road, to be judged of by the public authorities, and that decision must be final.
 
 Charles River Bridge
 
 v.
 
 Warren
 
 Bridge, 11 Peters’, 420. But in this State, the jurisdiction is expressly conferred on the County Courts, by the acts of 1779 and 1784, and others, to appoint and settle ferries and lay out roads “ where necessary,” and to build bridges at the expense of the county, add to contract for the building of toll bridges, and to regulate the rates of ferriage and tolls. Therefore, whoever sets ferry or builds a toll bridge knows, that he does so subject to the future action of the County Court or Legislature, in authorising other ferries or bridges at other points on the same stream, though so near his own as to interfere with his tolls. But one may very willingly trust to the benign respect of the regular tribunals of the country for the claims on their consideration, from the hazards of his adventure, and the benefits derived from it to the public, who would not lay out a penny on the work, if every individual or voluntary association individuals might, of their own head, oppose to his a rival establishment, which would draw away all his profits, or a considerable part of them; and the more considerable the part the greater the injury, although a fair profit might be left on
 
 *624
 
 his outlay, as that is a consideration for the court in fixing the rate tolls, and not for private persons.
 

 But it is further insisted for the defendants, that they have' ^ authority of the court for building a bridge. First they rely on the right of an old ferry belonging to Jones at this point, and since, as they say, vested in Murray, who permits them to build the bridge, instead of building it himself, as he might do under the act of 1806, as the proprietor of the ferry. Upon this part of the case, it sufficiently appears, that in April, 1799, Jones was entitled to a ferry: his title was then declared by the County Court; and the bill admits that he kept up-the ferry until-that of Sams was established, and fora short time afterwards. But the bill states that then, 1801, Jones-found his ferry so unprofitable, as to let it go down,'and that-it was not used by the public for the last forty years and more.The answers almost admit the truth of that allegation. They' deny, indeed, that it was “annulled or discontinued
 
 accord' ing to
 
 law,” by which they mean, we suppose, that it was not suppressed by order of the court, and they would infer therefrom, that the title continued. But it is distinctly admitted,-
 
 “
 
 that for many years no regular ferry boat had been kept there,” and not a fact is stated to shew that the “ many years” do not embrace the whole period of non-user stated in the bill. The answers are too vague and equivocal to allow the court to found on them any contrary conclusion. Therefore, the franchise of Jones must be clearly understood to have been abandoned by him: fotty years omission to furnish the public with the service due from him, as owner of a ferry, must amou-nt to a surrender of his right to the exclusive franchise. This is the clearer from t’he admitted fact, that Murray himself, who is said to be the present owner of the land, applied to the court eight years ago for a new order to him to establish a ferrywhich shews that the former right was-considered by every one as no longer existing. We hold, therefore, even if the defendants had connected themselves with Jones, that they could not justify their proceedings under his title
 
 -f
 
 for, without clear evidence that Jones kept up his ferry within
 
 *625
 
 and long within the period of forty years, we should hold, that he could not build a bridge at the place, much less authorise the defendants to do so. ■
 

 It can hardly be necessary to say, that the claim set up under an alleged order of the County Court in favor of Murray, himself cannot be sustained ; for we can receive no evidence of the order, but the minute of it in the record, and it is admitted there is none such. If one had been made and was . omitted by the clerk, there would be a ready way to supply the omission. But there has been no action upon that order,, even if it appeared to have been made ; and the act of 1806, which allows a bridge to be built instead, of keeping the ferry,-, can only apply to a ferry, actually existing and in use at the time of substituting the bridge for the ferry.
 

 Neither can the defendants derive an authority to build the1 bridge from the establishment of a public road to the river, on each side of it,- supposing, even, that the river itself would thereby be made a part of the highway. It) the first place' these defendants do not appear to be the overseers of those roads, nor to be acting by the consent of the overseers. But the overseers themselves would not, under a mere order laying' out a road and appointing overseers,- be authorized to build a bridge over such a stream as this. The act, s. 14. and 15 directs an overseer to build causeways and necessary bridges “through swamps and over small runs, creeks, and streams,” and authorises him to cut poles and other timber to enable him to comply with the duty of making and repairing the bridges and causeways. It is apparent, that only such bridges are meant as can be conveniently built by the overseer and his hands in the time ordinarily employed in working on the road. And when the overseer and hands cannot convenient^ ly make it, the court is to contract for the building at the charge of the county s. 22, or contract for the building of a toll bridge by a grant of tolls to the builder, at the rate or for the terms agreed on s. 26. A fair construction of the act therefore requires, that, in cases where the overseer and hands cannot, as a duty, be required to build a bridge, the order of the
 
 *626
 
 court is proper and necesssaryto justify the building of the bridSe or tbe establ'sbment °f a ferry; and the appoint" ment of overseer is no more an authority to build abridge jn suc^ a case tjjan jt would be to set up a ferry. Before a bridge can be built over a large stream, interfering, as it may,with the rights of the owners of ferries or other bridges, the public mind must be consulted; and, in this respect, the public mind is, by the statute, kept by the County Court. It may, moreover, be mentioned, that in the case of the
 
 Newburg Turnpike
 
 v.
 
 Miller,
 
 5 John. C. C. 101, a public highway had been laid out, which embraced the free bridge; yet that did liot help the defendants, and the bridge was closed.
 

 Upon the whole, therefore, we hold very clearly; that the projected acts of the defendants are unauthorised, and, if perpetrated, would be highly mischievous to the public, and injurious to the plaintiff; and that the injunction was properly continued to the hearing. And we direct this to be certified to1 the Court of Equity.
 

 Per CubiaWj Ordered to be be certified accordingly.