18582. STATE OF GEORGIA *et al. v.* STATE TOLL BRIDGE AUTHORITY.

ARGUED MAY 12, 1954—DECIDED MAY 31, 1954.

*Eugene Cook, Attorney-General, C. Winton Adams, Paul Miller, Assistant Attorneys-General,* for plaintiffs in error.

*Bernard N. Nightingale,* for party at interest not party to record.

*Carlton Mobley, B. D. Murphy,* contra.

ALMAND, Justice. The Toll Bridge Authority Act (Ga. L. 1953, Jan.-Feb. Sess., p. 302), created a body corporate and politic to be known as the "State Toll Bridge Authority", to be an instrumentality of the State of Georgia, to consist of three members to be appointed by the Governor. The Authority was given power to acquire by condemnation or purchase real property or easements necessary to the purposes of the act, and to construct, erect, acquire, own, repair, maintain, extend and operate projects, to include one or more bridges together with the approaches thereto, the expense of such projects to be paid in whole or in part from the proceeds of revenue bonds of the Authority. A bridge is defined "to mean a structure erected in order to afford unrestricted vehicular passage over or under obstructions in the public highways of the State . . . including rivers, streams" and so forth. The Authority was authorized to borrow money for any of its corporate purposes, to issue negotiable revenue bonds payable from the earnings of such projects, and to provide for the payment of the same and for the rights of the holders thereof. The Governor of the State was given authority to convey on behalf of the State so much of the State's highway rights-of-way "as shall be necessary to the accomplishment of the purposes of this Act." The Authority was empowered to collect tolls on each and every project which it shall cause to be erected, the toll earnings necessary to finance the revenue bonds on each project to exceed the actual maintenance, repair, and normal reserve requirements of such projects, the Authority being charged with the duty of operating each project at the lowest possible level of toll charges. The act provided that when all the bonds, interest coupons, and obligations of every nature have been paid in full, the Authority shall convey all of its right, title and interest in such projects to the State for a consideration of one dollar. The Authority was authorized to issue negotiable revenue bonds for the purpose of paying all or any part of the cost of any one or of any combination of projects, said bonds to be paid solely from and secured by the pledges of tolls and other revenues of all or any of the projects financed. It was declared that the act of the Authority in carrying out its corporate purposes "is in all respects for the benefit of the people of this State, and that the Authority is

an institution of purely public charity, and will be performing an essential governmental function", and the State covenanted with the holders of the bonds that they would not be required to pay any taxes or assessment upon any of the property acquired or leased by it, and that the property of the Authority, as well as the bonds issued by it and the income derived therefrom "shall at all times be exempt from taxation within the State." The State also covenanted with the holders of such bonds not to erect or permit or suffer any State subdivision to permit the erection of any bridge, tunnel, or other crossing within 10 miles of any project constructed pursuant to this act. The act further provided that the Authority should have no authority to acquire, or to collect tolls on, any existing bridge or any project constructed by the State Highway Board or by any county or municipality which was originally free from tolls. It was declared that the act, being for the welfare of the State and its inhabitants, "shall be liberally construed to effect the purposes thereof."

On January 5, 1954, the State Highway Department, the State Highway Board and the individual members thereof, and Herman E. Talmadge as Governor, filed an action in Fulton Superior Court against the State Toll Bridge Authority, wherein they sought a declaratory judgment and equitable relief, challenging the constitutionality of the act creating the State Toll Bridge Authority, as a whole and certain sections thereof. The defendant filed its response, in which it denied the allegations of the petition as to the unconstitutionality of the act of 1953. It likewise prayed for a declaration by the court as to the constitutionality of said act and every part thereof, and in addition sought other declaratory judgment relief. The cause came on to be heard and evidence was introduced to establish the allegations of fact set forth in the petition and in the answer, and on March 11, 1954, the court entered its decree and finding, declaring that the act of 1953, as a whole and in all of its parts which were attacked as being violative of the Constitution of Georgia, was not invalid for any reason set forth in the petition, and further finding that the action taken and proposed to be taken by the State Highway Department, the State Highway Board, and the Governor of Georgia and the State Toll Bridge Author-

ity set forth in the petition and answer, and the proposed trust indentures, were authorized by the act of 1953; that the revenue bonds to be issued to finance the construction of toll bridges as authorized by the act would constitute valid obligations of the State Toll Bridge Authority and would not constitute debts of the State of Georgia; that the bridge as defined by the act and to be constructed by said Authority would be exempt from taxation, and that the revenue bonds to be issued pursuant to the act, and the income therefrom, would likewise be exempt from taxation; and denying the plaintiffs' prayer for interlocutory relief.

The plaintiffs by bill of exceptions bring the case here for review, assigning error specifically on each and every ruling of the trial court.

1. It is contended that the Toll Bridge Authority Act violates the following provisions of the Constitution of Georgia: (a) art. VII, sec. III, par. I (Code, Ann., § 2-5601), forbidding the contracting of a debt by the State except in emergency situations which are inapplicable here, in that the scheme of the act is to permit the defendant to do indirectly what the State cannot do directly, that is, to borrow money, and that the revenue bonds proposed to be issued will as a matter of fact constitute debts of the State within the meaning of this paragraph of the Constitution; (b) art. VIII, sec. III, par. II (Code, Ann., § 2-5602), prohibiting an increase of the bonded indebtedness of the State except in emergency situations not applicable here; (c) art. VII, par. III, sec. IV (Code, Ann., § 2-5604), forbidding the pledge of the credit of the State to any individual, company, corporation or association; (d) art. VII, sec. III, par. V (Code, Ann., § 2-5605), forbidding the State to assume any part of the debt of any county, municipal corporation or political subdivision thereof otherwise than in specified situations not applicable here.

In *McLucas* v. *State Bridge Building Authority*, ante, p. 1 (77 S. E. 2d 531), we had before us the question of the constitutionality of the act of March 25, 1953 (Ga. L. 1953, Jan.-Feb. Sess., p. 626), creating the State Bridge Building Authority. The legislative scheme as to the creation, powers and authority of the Bridge Building Authority is practically identical with that followed in the act creating the Toll Bridge Authority. Both

Authorities are declared to be bodies corporate and politic, and instrumentalities of the State, with express provision that the revenue bonds to be issued shall not constitute debts of the State directly or indirectly, or obligate the State to levy or pledge any form of taxation, or to levy any appropriation for their payment. In that case, it was held that the Bridge Building Authority Act was not violative of the above constitutional provisions. For the reasons stated in that case, and in *State of Georgia* v. *Board of Regents of the University System of Georgia,* 179 *Ga.* 210 (175 S. E. 567), and *Sheffield* v. *State School Building Authority,* 208 *Ga.* 575 (68 S. E. 2d 590), we hold that the Toll Bridge Authority Act does not violate any of the provisions of the Constitution of Georgia enumerated above.

The contention of counsel for the plaintiffs in their briefs that the tolls to be collected from those who use the bridge to be built by the Toll Bridge Authority to retire the revenue bonds are in effect a special tax upon those who use the bridge, is not tenable. The tolls to be collected by the Authority are reasonable charges to reimburse it for building and maintaining the bridge, and the universal ruling is that they do not constitute the payment of taxes. Sands *v.* Manistee River Improvement Co., 123 U. S. 288 (8 Sup. Ct. 113, 31 L. ed. 149); Salt Creek Val. Turnpike Co. *v.* Parks, 50 Ohio 568 (35 N. E. 304, 28 L. R. A. 769); Virginia Canon Toll-Road Co. *v.* Vivian, 22 Colo. 429 (45 Pac. 398, 37 L. R. A. 711); Curren *v.* Schommer, 392 Ill. 17 (63 N. E. 2d 744). See annotation in 167 A. L. R. 1356. Tolls for the use of a bridge are analagous to tuition charged by some public educational institutions, or fees by a public charity hospital, that is, compensation for the use of a public facility.

2. It is insisted that the Toll Bridge Act and the action proposed in completing the Turtle River Bridge is violative of art. III, sec. VII, par. XVII of the Constitution (Code, Ann., § 2-1917), in that said act grants corporate powers and privileges to the Toll Bridge Authority, a private corporation. The same attack was made in the *McLucas* case, where we held that there was no merit in the contention, "because the State Bridge Building Authority is an instrumentality of the State and a public corporation, created as such by the General Assembly with corporate power to finance and construct such bridge proj-

ects as the State Highway Board for the benefit of the State Highway Department may request." P. 14.

In the amicus curiae brief filed in the instant case, it is contended that this paragraph of the Constitution absolutely prohibits the State from establishing bridges, and that this question was not raised in the *McLucas* case, and its real meaning was not there considered. The paragraph of the Constitution just referred to has for its subject-matter "Corporate powers, how granted," and the pertinent provision of the paragraph reads as follows: "The General Assembly shall have no power to grant corporate powers and privileges to private companies, to make or change election precincts nor to establish bridges or ferries, nor to change names of legitimate children; but it shall prescribe by law the manner in which such powers shall be exercised by the courts; it may confer this authority to grant corporate powers and privileges to private companies to the judges of the superior courts of this State in vacation." It is apparent that it was the purpose of this provision to prohibit the granting of powers to the General Assembly to establish specific bridges and ferries, as was the practice of the General Assembly prior to the act approved February 7, 1854 and Dec. 12, 1855 (Ga. L. 1855-56, p. 105), amending the Constitution, but to authorize the legislature to confer such power on the judges of the superior courts. This paragraph in no wise attempts to prohibit the General Assembly from constructing bridges through its public agencies, such as counties, municipalities, or other instrumentalities of the State. That the General Assembly does have such power is borne out by art. VII, sec. II, par. I of the Constitution (Code, Ann., § 2-5501 (6)), which provides that the General Assembly has power to levy taxes for the construction and maintenance of "a system of State highways." Code § 102-103 defines a highway as including a bridge. The contention that the General Assembly is unauthorized to empower a public agency such as the Toll Bridge Authority to construct bridges as parts of its highway system is without merit. The power to construct and maintain public highways may be exercised by the legislature in such manner directly or through duly constituted public authorities, as it deems best. Code (Ann.) § 2-5501 (6), supra. *Southern Ry. Co.* v. *Combs*, 124 *Ga.* 1004 (53 S. E. 508); *City of Atlanta* v. *Gate City Gas Light Co.*, 71 *Ga.* 106 (3).

3. The act under consideration does not violate art III, sec. VII, par. X of the State Constitution (Code, Ann., § 2-1910), which requires that all bills for raising revenue or appropriating money shall originate in the House of Representatives (the act in question having originated in the Senate). The act not being one to raise revenue or appropriate money, does not fall within the inhibition contained in this paragraph. *McLucas* v. *State Bridge Building Authority*, supra, p. 13 (6).

4. The contention is made that the action proposed to be taken with respect to the Turtle River Bridge by the Toll Bridge Authority, and particularly section 7 of the Toll Bridge Authority Act, violates art. VII, sec. I, par. II of the State Constitution, (Code, Ann., § 2-5402), in that the act of the Governor, as authorized by that section of the act, in conveying to the Toll Bridge Authority the State's rights-of-way including the approaches to the Turtle River Bridge for such consideration as the Governor, the Attorney-General and the State Auditor shall determine, would constitute a donation by the State to this Authority. This contention is without substance. Such conveyance has for its purpose the carrying out of the legislative plan for the construction of bridges by a public authority for use by the public as a part of a State system of highways, and when the revenue of the tolls has retired the indebtedness of the Authority in constructing and maintaining the bridge, the bridge with the rights-of-way will be returned to the State. "It is a conveyance of property in aid of a public purpose from which great benefit to the State and its citizens is reasonably expected." *McLucas* v. *State Bridge Building Authority*, supra, p. 11.

5. Section 28 of the Toll Bridge Authority Act declares that the creation of the Authority "is in all respects for the benefit of the people of this State, and that the Authority is an institution of purely public charity and will be performing an essential governmental function in the exercise of the power conferred upon it by this Act, and this State covenants with the holders of the bonds that the Authority shall not be required to pay any taxes or assessments upon any of the property acquired or leased by it or under its jurisdiction, control, possession or supervisions or upon its activities in the operation or maintenance of the projects erected by it or any fees, tolls or other charges for the

use of such projects or other income received by the Authority, and that the bonds of the Authority, their transfer, and the income therefrom shall at all times be exempt from taxation within the State." It is contended that this section of the act violates paragraphs I, II and IV of art. VII, sec. I of the State Constitution (Code, Ann., §§· 2-5401, 2-5402, 2-5404), in that the property sought to be exempted from taxation is not within the enumerated classes of property specifically authorized to be exempted from taxation by the General Assembly, and that the General Assembly has no power to surrender the sovereign right of the State to tax the property of the Authority and the holders of its bonds, and that this exemption from taxation operates as a donation or gratuity in favor of the Authority and the holders of its bonds.

The identical provisions as to the Toll Bridge Authority being a charitable corporation, and as to the exemption of its property, and of the bonds issued by it, from State taxation, contained in section 28 of the act here under attack, were incorporated in section 30 of the act creating the State Bridge Building Authority, and in the *McLucas* case the same attacks here made were reviewed and determined adversely to the contentions of the present plaintiffs. It is asserted that the rule there laid down does not control here, for the reason that the bridges to be erected by the Toll Bridge Authority are not free bridges, as were the bridges involved in the *McLucas* case, but tolls or charges will be made for the use thereof and the revenues derived therefrom will be used to pay private investors who own the bonds, and none of the public will benefit from the use of the bridge except those who are able to pay the toll charges, and that to denominate a toll bridge as a charity is a manifest abuse of the word "charity".

The only real and substantial difference between the Toll Bridge Authority Act and the Bridge Building Authority Act is as to the manner in which the Authorities reimburse the indebtedness incurred in constructing the bridges. In the case of the Toll Bridge Authority Act, the bonds are paid from tolls, while under the Bridge Building Authority Act such bonds are paid out of revenue paid by the State Highway Department in the form of stipulated annual rental. In one case, payment of the cost of building a bridge comes only from those who use it, and

in the other case such cost would be borne by the public at large through taxation, regardless of whether all who paid the taxes used or had not used the bridge. When a toll bridge is built, tolls or charges will be at the "lowest possible level", and for only as long as is necessary to retire the indebtedness incurred in its construction. The Toll Bridge Authority is not engaged in the business of making profit or receiving private income. The fact that it makes a reasonable charge for the use of the bridge to cover the cost of construction and operation, does not prevent it from being a charitable institution and an instrument of public charity. *Linton* v. *Lucy Cobb Institute,* 117 *Ga.* 678 (45 S. E. 53); *Brewer* v. *American Missionary Association,* 124 *Ga.* 490 (52 S. E. 804); *Hurlbutt Farm* v. *Medders,* 157 *Ga.* 258 (121 S. E. 321); *Williamson* v. *Housing Authority of City of Augusta,* 186 *Ga.* 673 (199 S. E. 43).

We therefore hold that section 28 of the act, which declares the Toll Bridge Authority to be an institution of public charity and exempts its property and the revenue bonds issued by it in the hands of holders to be exempt from taxation, is not invalid for any reason assigned. *McLucas* v. *State Bridge Building Authority,* supra.

6. The proposed action to be taken by the Toll Bridge Authority in the instant case is to complete the Turtle River Bridge, which is now about one-half completed, in which construction the State of Georgia has spent several million dollars, and to pledge the completed structure, by the payment of reasonable tolls to be collected for the use of the bridge, to payment of the indebtedness to be incurred therefor. It is contended that this proposed action would violate the several provisions of the State Constitution as to State debts, the pledging of its credit, and the granting of donations.

The answer to this objection is that the Authority proposes only to issue a sufficient amount of revenue bonds to finance the completion of the bridge, the tolls charged to be used to liquidate the indebtedness thereby incurred, and the Authority will not reimburse the State or Federal government for funds already expended in constructing the bridge. It cannot be said that the State thereby increases its debt, pledges its credit, or donates its property. Though the title to the bridge is in the Authority

until the cost of construction is paid from collection of tolls, the sole benefit of the bridge is in the public who use it.

7. It is also urged that the power granted in the act did not include power in the Governor to convey a partly completed bridge to the Authority, in that section 37 thereof forbids the Governor from conveying to the Authority an existing bridge or any bridge constructed by the State Highway Board.

The undisputed evidence shows that the Turtle River Bridge when completed will have a total length of 4,470 feet; that the construction work already done on the bridge consists of piers and 987 feet of bridge superstructure, which is the total length of construction of both sides of the bridge; that there is uncompleted 3,483 feet of superstructure and the entire decking of the bridge including the draw span, and that it is impossible at present for any sort of traffic by vehicles or on foot to cross Turtle River by means of the existing structure.

Section 3 (c) of the act defines a bridge as a structure "erected in order to afford unrestricted vehicular passage." Code § 102-103 defines a highway as including bridges upon the same. A thoroughfare which is used by and is common to all the public, and which the public has the right to use, is a highway (*Southern Ry. Co.* v. *Combs*, 124 *Ga.* 1004 (1), 53 S. E. 508), and includes overland ways. *Griffin* v. *Sanborn*, 127 *Ga.* 17 (56 S. E. 71). A bridge is a part of a highway whether it is a toll or a free bridge. *McLeod* v. *Savannah &c. R. Co.*, 25 *Ga.* 445. The word "exist" means "to be in present force, activity, or effect at a given time." Black's Law Dictionary. To the average mind the word "bridge" means a passageway over water or land by which persons traveling on foot or in vehicles can safely travel. The Turtle River Bridge, under the evidence in this case, in its present stage of construction could not afford passageway by anyone except a tight-rope walker. The present structure has no more existence as a "bridge" than when it was in the blue print stage, and does not "exist" as a bridge within the meaning of section 37 of the act. A statute applicable only to "existing buildings" does not apply to a new building in process of construction. In re Harrington's Estate, 151 Neb. 81 (36 N. W. 2d 577); Fortunato *v.* City of Coral Gables (Fla., 1950), 47 So. 2d 321; Hyman *v.* Leo, 177 N. Y. S. 503 (108 Misc. 39). Excavation and engineering

work, and forms constructed, do not constitute an "existing structure" within the meaning of a statute relating to building restrictions. Brett *v.* Building Commissioner of Brookline, 250 Mass. 73 (145 N. E. 269). The words "existing building" in a zoning ordinance mean a building which was in existence at the time of the adoption of the ordinance. Fortunato *v.* City of Coral Gables, supra. A contemplated city auditorium authorized by a bond issue is not an "existing public institution." Saylor *v.* Walt, 66 S. Dak. 14 (278 N. W. 12).

8. It is the contention of the plaintiffs that the corporate limits of the City of Brunswick extend to the middle of Turtle River; that the right-of-way of this portion of the approach to the bridge which lies within the City of Brunswick has been dedicated to the public use before it was acquired by the State, and that when such rights-of-way are conveyed to the Authority they will revert to the property owners from whom they were acquired. As was said in the *McLucas* case, "The Act contemplates, has for its purpose, and expressly provides for a continued use of the rights-of-way for highway purposes only, for the improved use of them as a part of the State's permanent system of highways." P. 11. The court correctly held that this right-of-way would not revert to any former owner, so long as it is used for the purposes contemplated by the act.

Furthermore, the City of Brunswick is a political subdivision of the State, created by legislative enactment, and subject, in all respects, to the control of the General Assembly. It is competent for the General Assembly to legislate concerning the public streets or highways within the limits of a municipality. Such enactment binds the municipal corporation, as well as its citizens, as to any right or privilege claimed by the city by virtue of the dedication of its streets for public use, whether the dedication be by contract or otherwise. *Lee County* v. *Mayor &c. of Smithville*, 154 *Ga.* 550, 556 (115 S. E. 107); *Green* v. *State Highway Board*, 172 *Ga.* 618 (158 S. E. 329); *Mitchell County* v. *Cochran*, 162 *Ga.* 810 (134 S. E. 768).

9. It is asserted that section 7 of the act, which authorizes the Governor to convey to the Toll Bridge Authority so much of the State's highways and rights-of-way as may be necessary for the accomplishment of the purposes of the act, does not author-

ize the conveyance of a partly completed bridge on which the State has already expended several million dollars; that if this section of the act be construed to the contrary, it violates art. III, sec. VII, par. VIII of the Constitution (Code, Ann., § 2-1908), for the reason that the caption of the act makes no reference to this matter.

One of the purposes declared in the caption of the act is "to authorize and empower the Governor to convey State rights-of-way for such projects." This clearly covers the provisions of section 7, the main object of the act being to provide for the erection of toll bridges by an instrumentality of the State, and this section provides one of the means necessary to the accomplishment of one of the purposes of the act, viz., the conveyance by the Governor of the State's rights-of-way upon which the bridge is to be built.

10. Section 31 of the act provides: "The State covenants with holders of bonds issued pursuant to this Act not to erect or permit, or suffer any State subdivision to permit, the erection of any bridge, tunnel, or other crossing within ten miles of any project constructed pursuant to this Act; provided, that should it be determined by the State Highway Board and the Authority that the construction of such bridge, tunnel or crossing would not diminish or adversely affect traffic over such projects, then it shall be permissible to erect such bridge, tunnel or other crossing. The provisions of this Act shall be for the benefit of the State, the Authority, and each and every holder of the Authority's bonds, and upon and after the issuance of bonds under the provisions of this Act shall constitute an irrevocable contract with the holders of such bonds." It is averred that this section violates (a) art. III, sec. VII, par. VIII of the State Constitution (Code, Ann., § 2-1908), for the reason that the caption of the act makes no reference to including in the act any limitation upon the power of the State and does not authorize the State to enter upon such contract or covenant, and violates (b) art. III, sec. I, par. I thereof (Code, Ann., § 2-1301), because it is an attempt to limit or restrict the legislative power of the State and to prevent future General Assemblies from permitting the construction of any bridge or crossing within 10 miles of the bridges to be constructed under the act.

(a)   Among the purposes of the act as recited in the caption thereof is "To authorize the execution of trust indentures to secure the payment of such bonds, and to define the rights of the holders of such bonds", and "for other purposes."   The provisions of section 31 are germane to the general subject matter embraced in the title of the act, and are designed to carry into effect the purposes for which it was passed, and may be constitutionally enacted though not specifically referred to in the caption. *Burns* v. *State,* 104 *Ga.* 544 (1)  (30 S. E. 815) ; *Bass* v. *Lawrence,* 124 *Ga.* 75  (52 S. E. 296) ; *Copeland* v. *Leathers,* 206 *Ga.* 280  (56 S. E. 2d 530). The provisions of this section are for the benefit of the holders of the revenue bonds, and are germane to the caption of the act, which announces that one of the purposes of the act is to authorize the issuance of revenue bonds payable from tolls or earnings of the Authority, and to define the rights of the holders of such bonds.

(b)   From the earliest beginnings of our nation the legislatures of the several States of the Union have exercised almost complete power in the construction and regulation of public toll bridges, as to private companies, licensing and preventing the establishment of rival bridges within prescribed distances. Charles River Bridge *v.* Warren Bridge, 36 U. S. 419 (9 L. ed. 773, 938) ; County Commissioners *v.* Chandler, 96 U. S. 205 (24 L. ed. 625) ; Wright *v.* Nagle, 101 U. S. 791 (25 L. ed. 921) ; Copcutt *v.* City of Yonkers, 83 Hun. 178, 64 N. Y. St. R. 286, 31 N. Y. S. 659. At common law a bridge erected so near an ancient toll bridge as to draw away its customers was a nuisance for which an action would lie. Harrell *v.* Ellsworth, 17 Ala. 576; Smith *v.* Harkins, 38 N. C. 613 (44 Am. D. 83).

Prior to the act approved Feb. 7, 1854 and Dec. 12, 1855 (Ga. L. 1855-56, p. 106), which was an amendment to the Constitution, the General Assembly of Georgia by grant, charter or license authorized private companies to erect toll bridges and ferries, some of these grants restricting the maintenance or operation of other bridges or ferries within fixed distance from the bridge or ferry so authorized. For a compilation of these grants, see "Prince's Georgia Digest" 1837, pp. 974-76. As far as the research of the writer of this opinion has discovered, the right to grant a franchise to operate a bridge or ferry in Georgia has

always been in the State, exercised either by the General Assembly or by some public subdivision such as a county or municipality. "The right to establish and keep a public bridge or ferry is a franchise to be granted by the State" (Code § 85-1311), but such a franchise when granted is not exclusive unless plainly and expressly so declared to be so in the grant. Code § 85-1312. In the case of *McLeod* v. *Burroughs*, 9 *Ga.* 213, this court said (at p. 222): "The grant to Hill of the privilege of building a bridge over the Ogeechee River, with a right to charge toll, is not, I admit, a monopoly, because, to erect a bridge and charge toll is not a common right which belongs to all the citizens of the State. It is a right which can only be enjoyed under a grant from the Legislature. But when this right is granted, and with it is coupled an exclusive privilege within a prescribed distance, it becomes in the nature of a monopoly. For so long as it is exercised in accordance with the charter, the Legislature cannot revoke it; and the right of the citizen, common to all to ask for and receive such a grant from the Legislature, is precluded. Not only so, but the prohibition against other bridges within the prescribed distance operates as a restraint upon the right of the citizen, which is common to all, to pass the stream, in pursuit of business or pleasure, at any point most convenient to him."

In our opinion the General Assembly, in the exercise of its legislative powers, has the authority to grant the franchise to the Toll Bridge Authority exclusive in the form of covenants with bondholders prohibiting the building of a bridge in competition within restricted limits. The covenant in the act with the bondholders by the State that it would not erect or permit or suffer any State subdivision to permit the erection of any bridge, tunnel or other crossing within 10 miles of any bridge constructed pursuant to the act, and that after the issuance of the bonds under the provisions of the act the same "shall constitute an irrevocable contract with the holders of such bonds" does not of itself limit or restrict future legislatures from legislating on the same subject matter. Any act of the legislature is subject to repeal by a future legislature, so long as the repealing act does not violate the provisions of the State and Federal Constitutions against laws which impair the obligation of contracts. Until the Authority issues bonds, or vested rights of third persons have

intervened, the act creating the Authority can be repealed, but after the bonds are issued and bought, the contract between the State and the bondholders comes into existence, and the limitation on future legislatures to permit the erection of a competing bridge, tunnel or crossing within 10 miles of the Turtle River Bridge, is by virtue of the bondholders acquiring vested contract rights, and not because of any restriction placed by the legislature in enacting the law. If the argument of the plaintiffs were carried to its logical conclusion, the General Assembly could never authorize the making of a contract as to the sale or lease of the property of the State. The act in question being in the exercise of its constitutional power by the General Assembly, was equivalent to a contract, and when performed is a contract executed, and whatever rights are thereby created a subsequent legislature can not impair. *Winter* v. *Jones*, 10 *Ga.* 190 (5) (54 Am. D. 379); The Binghamton Bridge, 70 U. S. 51 (18 L. ed. 137); Enfield Toll Bridge Co. *v.* Hartford & New-Haven Railroad Co., 17 Conn. 40.

11. Subsection 4 of section 4 of the act provides that the Authority shall have power "to appoint such additional officers, who need not be members of the Authority as the Authority deems advisable, and to employ such experts, employees and agents as may be, in its judgment, necessary; to fix their compensation and to promote and discharge such officers, employees and agents. Provided that over any four-year period the total compensation paid under this power shall never exceed an average of $25,000 per annum." It is asserted that the court erred in its decree that the limitation of total compensation does not apply to those employees of the Authority engaged in the acts of operation, maintenance and running of the toll bridges constructed by the Authority, but applies only to administrative agents or employees not actually engaged in the operation or maintenance of the bridges.

The toll bridge act does not limit the Authority with respect to the number of toll bridges that it may construct, or limit the amount of bonds that may be issued on one or more bridges, or fix an aggregate amount of tolls that may be collected to maintain and operate the bridges. In the answer, it is alleged by the defendant that the actual cost according to estimates of com-

petent engineers of operating and maintaining the proposed Turtle River Bridge would exceed $25,000 per year. To hold that the General Assembly by this section meant to place a limit as to the total compensation to be paid per year to all employees, administrative and operative, on all bridges, would virtually destroy the purpose the legislature had in mind, viz., the maintenance and operation of toll bridges for public use. The court's construction of this section was not erroneous.

12. The petition attacks as unauthorized a contract between the Authority and the State Highway Department, set forth in substance by the pleadings, whereby the Department agrees to do certain things and to refrain from doing certain things with respect to the Turtle River Bridge and U. S. Route 17. The obvious purposes of the agreement are to promote the use of the bridge and protect it against competition. The agreement is in the public interest and for the benefit of the State, as declared by the act. The agreement is binding upon the Authority and the Department, and is in conformity with the act. This attack is without merit.

We have examined the various finding and declarations of the court as to the action of the parties completed or proposed, and find that those actions are authorized by or in conformity to the Toll Bridge Authority Act. The judgment of the trial court declaring the rights and duties of the parties and denying the prayer for an injunction is not erroneous for any reason assigned.

*Judgment affirmed. All the Justices concur. Wyatt, P. J., concurs specially.*

WYATT, P. J., concurring specially. I concur in so much of this opinion as deals with tax exemptions for the sole reason that I am bound by former decisions of this court.