547 F.2d 511
 AMERICAN EMPLOYERS INSURANCE COMPANY, Plaintiff-Appellee,
v.
The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF ADAMS,
STATE OF COLORADO, Defendant-Appellee,
Stanley Eugene Zierlein et al., Defendants-Appellants,
Employers Mutual Casualty Company, Intervenor-Appellant.
 Nos. 75-1004, 75-1005.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted March 22, 1976.
Decided Dec. 14, 1976.
 
 1
 Arthur S. Bowman, Denver, Colo. (Bowman, Shambaugh, Geissinger & Wright, Denver, Colo., on brief), for defendants-appellants Holman, Zierlein and Sheets.
 
 
 2
 Robert R. Montgomery, Denver, Colo. (J. Bayard Young, Montgomery, Little, Young, Ogilvie, Campbell & McGrew, Denver, Colo., on brief), for intervenor-appellant.
 
 
 3
 Larry W. Berkowitz, S. Morris Lubow, Brighton, Colo., for defendant-appellee Bd. of County Commissioners.
 
 
 4
 Albert E. Zarlengo, Jr., Denver, Colo. (John C. Mott, Zarlengo, Mott & Zarlengo, Denver, Colo., on brief), for plaintiff-appellee American Employers Ins. Co.
 
 
 5
 Before LEWIS, Chief Judge, SETH, Circuit Judge, and MORRIS, Chief District Judge.*
 
 
 6
 MORRIS, Chief District Judge.
 
 
 7
 In this case appellants challenge the trial court's determinations with respect to the liability of an insurer on an insurance policy and the effect of certain Colorado statutes having to do with sovereign immunity.
 
 
 8
 Appellee American Employers Insurance Company (American Employers) brought this declaratory judgment action against all the other parties except the intervenor to determine its liability under an insurance policy. Appellee Board of County Commissioners for the County of Adams is the named insured on the policy. The incident which prompted the declaratory judgment action was an accident in Adams County in which two vehicles crashed into a creek bed at a place where bridge approaches had been washed away. Appellants Zierlein and Sheets allegedly sustained personal injuries in the accident and appellant Holman, owner of both vehicles, allegedly sustained property damage. The individual appellants asserted a counterclaim against American Employers and a cross-claim against the County, asserting that they were entitled to damages because the accident was caused by the County's negligence. The County, in answer to American Employers complaint, contended that the policy did cover the accident. However, the County also asserted a cross-claim against the individual appellants, contending that if it were determined that the insurance policy did not cover this accident, then the County would in any event be immune from liability on the accident by virtue of the doctrine of sovereign immunity. Appellant Employers Mutual Casualty Company (Employers Mutual) intervened in the action, filing an answer, counterclaim and cross-claim, asserting subrogation rights as to the claims of the individual appellants.
 
 
 9
 On November 8, 1974, a non-jury trial was had solely on the two issues of the existence of insurance coverage and the applicability of the doctrine of sovereign immunity. In findings of fact and conclusions of law announced from the bench that same day the trial court found for American Employers and the County and against the individual appellants and the intervenor, Employers Mutual. Specifically, the court held, in a judgment entered November 20, 1974, that American Employers' insurance policy did not provide coverage as to this accident and American Employers was accordingly not liable on the counterclaims but that American Employers was nonetheless obligated to defend the County as to claims for damages arising from the accident. The court further held that, because of sovereign immunity, the County was not liable to any of the appellants on their cross-claims.
 
 
 10
 All these holdings, except that as to American Employers' duty to defend, are challenged by appellants here. Appellants contend that the insurance policy covered the accident and that, accordingly, both American Employers and the County are liable. Alternatively, appellants argue that even if there is no insurance coverage, the County is still liable because the statute purportedly reserving sovereign immunity as to such county roads, while waiving sovereign immunity as to other types of roads, is unconstitutional.
 
 
 11
 Appellants' two contentions will be discussed separately. Certain undisputed facts are material to both issues. On May 6, 1973, there was widespread flooding in Adams County, Colorado, causing extensive damage. On a county road, known as Bromley Lane, the flood waters undercut and washed away the asphalt portions of the approach to a bridge over Sand Creek. The bridge subsequently collapsed. On May 18, 1973, two vehicles travelling along Bromley Lane plunged into the creek bed at the site of the washed out bridge approaches. Appellants sustained personal injuries and property damage as a result of the accident.
 
 
 12
 I. Insurance Coverage.
 
 
 13
 The Colorado Governmental Immunity Act provides, in relevant part, as follows:
 
 
 14
 (1) Notwithstanding any provision of law or of this article to the contrary, if a public entity provides insurance coverage provided by an insurance company authorized to do business in this state to insure itself against liability for any injury or to insure any of its employees against his liability for any injury resulting from an act or omission by such employee acting within the scope of his employment, then such public entity shall be deemed to have waived the defense of sovereign immunity in any action for damages for any such injury insured against, subject to the provisions of subsection (2) of this section.
 
 
 15
 (2) If the defense of sovereign immunity would be available to a public entity except for the provisions of subsection (1) of this section, then damages for injury shall not be recoverable in excess of the amount of the insurance coverage and shall be recovered from the insurer only. The insurer shall not be named as a party defendant. Colo.Rev.Stat. § 24-10-104.
 
 
 16
 It is not disputed in this case that if the insurance policy covers the accident, the doctrine of sovereign immunity does not apply. American Employers admits that its insurance policy written on the County was in full force and effect on the day of the accident and that it provided general liability coverage.
 
 
 17
 It is also not disputed that the policy included an endorsement which provides as follows:
 
 
 18
 It is agreed that this policy shall not apply to accidents arising out of the existence of county Highways or Roads except those caused by or arising out of and occurring during the course of street, road or highway construction, reconstruction, repair, cleaning or snow removal operations by or on behalf of the insured.
 
 
 19
 The trial court held that this endorsement excluded American Employers' liability as to the accident involved here. Appellants contend that this holding was erroneous.
 
 
 20
 Appellants argue, first, that this accident arose, not from the "existence" of a county road, but from the "non-existence" of a county road so that the policy exclusion predicated on "existence" is not applicable here. Appellants cite us no authority so construing such a clause. They rely, instead, on cases defining "existence" as that which actually is or that which is in present force, activity or effect. In re Harrington's Estate, 151 Neb. 81, 36 N.W.2d 577, 582 (1946); State v. State Tollbridge Authority, 210 Ga. 690, 82 S.E.2d 626 (1954). They also rely on a case defining "existing public streets" as those portions of a road which can be used by the public for the purpose of ordinary travel, as opposed to the total public right of way. Farina v. Zoning Board of Appeals, 157 Conn. 420, 254 A.2d 492 (1969). Appellants argue that since the bridge approaches here had washed away and were not usable at the time of the accident, the road did not exist. American Employers contends, on the other hand, that Bromley Lane did exist at the time of the accident.
 
 
 21
 In the policy endorsement the term "existence" is used only to distinguish county-owned land which is devoted to roads from county land which is not devoted to roads. It is not argued in this case that Bromley Lane had ceased to be a road and there is no evidence in the record indicating that the road had been abandoned by the County or that future use of it was not at all times contemplated. Even those portions of Bromley Lane which were not immediately usable for transportation remained parts of a road for the purposes of distinguishing road land from non-road land and, thus, for the purposes of this policy endorsement.
 
 
 22
 Furthermore, the exclusion is directed at a class of risks those risks arising from the existence of county roads. In this context the term refers to risks arising from the fact of or on account of county roads. That these are the excluded risks is further shown by the fact that accidents arising from affirmative County activities on the roads are specifically included in coverage. The endorsement lists as exceptions to the exclusion clause accidents "caused by or arising out of and occurring during the course of street, road, or highway construction, reconstruction, repair, cleaning or snow removal operations." The policy endorsement is clearly intended to exclude coverage as to risks other than these. In this context, the term "existence" of county roads clearly means "on account of" or "condition of" or "fact of" county roads.
 
 
 23
 Appellants would interpret "existence" as synonymous with "physical integrity." Appellants argue, in effect, that if a road is not intact, it has ceased to exist. Such a reading would make coverage turn on the kind of damage sustained by the road, a distinction which does not seem intended and which would lead to irrational results. Under such a reading, for instance, injuries due to rock slides would be covered if the rock slide carried away a portion of the road but would not be covered if the rock slide left the road obstructed or broken but intact. Such distinctions are not inherent in or intended by the use of the word "existence" in the policy endorsement. A reading of the endorsement which requires such distinctions is clearly forced and not intended.
 
 
 24
 American Employers contends that it was to just such incidents as this one that the endorsement was directed. A common sense reading of the endorsement compels us to agree. The accident alleged in this lawsuit was one arising from the existence of a county road, as that term is used in the policy endorsement.
 
 
 25
 Appellants further argue that, in any event, the endorsement does not relieve American Employers of liability in this case because the accident here arose out of and occurred during the course of construction, reconstruction or repair of the road. American Employers denies that any of these activities were in progress at the time of the accident.
 
 
 26
 The facts with respect to the question are not disputed. About two weeks prior to the accident there had been extensive flooding which caused road and bridge damage in various parts of Adams County. On Bromley Lane, the road involved in this case, the approaches to the bridge over Sand Creek were washed away and the bridge itself eventually collapsed. A number of other bridges and bridge approaches on Bromley Lane were also damaged by the flood. Immediately after the flood, the county road supervisor erected warning barriers on either side of the washout at Sand Creek. Bromley Lane is an east-west county road, some 26 miles in length. About one mile west of Sand Creek Bromley Lane is intersected by state highway 79, which is a north-south state highway. At the time of this accident the damaged bridges on Bromley Lane west of state highway 79 had all been repaired. The closest repair work was 21/2 miles west of Sand Creek. As of the date of the accident no men or equipment had been deployed at the Sand Creek site and no plans had been drawn up or specific decisions made about the nature of the work to be undertaken at Sand Creek. However, it was acknowledged by road officials that "something" would have to be done at the Sand Creek crossing and the repair of the crossing had been discussed.
 
 
 27
 Appellants argue that these facts show that repairs were sufficiently under way at Sand Creek to invoke the policy endorsement exception with respect to coverage for accidents arising out of street repairs. American Employers contends that the exclusion exception for repairs is not applicable because no repairs had been undertaken at the specific site and so the accident could not have been caused by and could not have arisen from any such repairs and could not have occurred during the course of repairs, as required by the exclusion exception clause. At trial, the dispute focused on whether or not the barriers erected by the county road supervisor constituted the commencement of repairs for the purposes of the policy. The trial court found that repairs had not begun and that, accordingly, no liability attached by virtue of the endorsement exception.
 
 
 28
 Here, appellants contend that, factually and as a matter of law, the placement of the warning markers and/or the initiation of repair work on other portions of Bromley Lane amounted to the commencement of construction, reconstruction or repair at the Sand Creek site for the purposes of the policy. Appellants further argue that the trial court's findings as to these questions were findings of "ultimate facts" or were legal conclusions and so are not insulated from review by the rule that factual determinations will not be overturned on appeal unless clearly erroneous. American Employers argues that the evidence shows that no repairs had actually been undertaken at the Sand Creek location and that the trial court's determination in this regard was a finding of fact, not assailable on review unless unsupported by the record. American Employers has not addressed the question whether the determinations here attacked are questions of law or fact or "ultimate fact" nor how the distinctions among such characterizations affect the scope of review. Inasmuch as we agree both with the findings and conclusions of the trial judge, it is not necessary for us to explore these distinctions.
 
 
 29
 Appellants argue that the initiation of actual repair work at some places along Bromley Lane was sufficient to constitute the initiation of repairs as to all the damaged sites on the road. Appellants contend that "Repairs, that is, actual physical repairs were underway on the entire length of Bromley Lane and had progressed east to a point about two and one-half miles to the west of the Sand Creek site." (Appellants' Brief at 6). They further assert that
 
 
 30
 (t)he facts indicate that the entire length of the county highway involved in this accident was under "reconstruction or repair" within the meaning of the policy language. Barricades had been set up at points of major damage, including the accident site, and work was proceeding along the length of the route. Though there is no evidence of reconstruction activity at the bridge at the time of the accident, the initial steps of repair had already been taken, including inspection, assignment of repair work, and erection of temporary barricades. The repair work thus begun had neither ceased nor been suspended at the time of the accident; in fact the accident site was soon to be repaired and work crews were proceedings (sic) toward it. The facts indicate that, giving the words "repair" and "reconstruction" their normal meanings, reconstruction or repair of this site had been commenced at the time of the accident.
 
 
 31
 In connection with these assertions we note that it does not appear from the record that any evidence was introduced showing that any work assignments had been made with respect to the Sand Creek site or that any decisions had been made with respect to the kind of work to be done there or as to when that work would occur.
 
 
 32
 It seems to be the gist of appellants' argument that the work on Bromley Lane was a single project, so that the commencement of repairs at any one spot, together with the erection of barriers at Sand Creek, served to place the entire route, and specifically the Sand Creek site, under repair. The trial court found that there was no single project but, rather, that the work on Bromley Lane and throughout Adams County involved a series of "spot jobs." The trial judge held that these several repair efforts were not a "continuous job which hadn't been worked out." There is evidence in the record to support this finding.
 
 
 33
 The witness Steele, the county road supervisor in that area of Adams County at the time, was asked, "It was my understanding from your deposition that you were repairing bridges on Bromley Lane your crews were and you were progressing eastward from your county line responsibility, somewhere east of Interstate 80, you were going eastward?" The witness replied, "And we did." He also testified that at the time of the accident repair work had been undertaken within 21/2 miles west of the Sand Creek bridge. However, the witness did not testify that a single work project had been drawn up with respect to continuous west-to-east repairs of Bromley Lane, with the whole route under systematic progressive repair. On the contrary, it is the thrust of the witness' testimony that the county road crew regarded the work as a series of spot jobs, aimed at eventually repairing all the flood-damaged roads in that sector of Adams County, but organized on a job-by-job, not a road-by-road priority basis. The efforts to repair this damage did not involve beginning repairs on Bromley Lane and continuing steadily, west to east along the Lane, until the road was completely passable. Indeed, the witness testified that the crew was working in an overall fashion to fix washed out bridge approaches throughout the area, that some of these washouts were on Bromley Lane, that by the day of the accident all the bridge approaches west of the Sand Creek bridge had been worked on, but that once Bromley Lane was open from the west to state highway 79, further eastward work had not been pursued but that "we had moved to State or to County Highway 24, because it does traverse the County from east to west, the entire distance; and I had some 160 barricades out. We were trying to establish a priority basis to benefit all of the people." (Tr. 29-30). We have been directed to no evidence other than Mr. Steele's testimony on this point and we have found none.
 
 
 34
 The record clearly supports the trial court's finding that this was not a single, continuous project, and we accept that finding. We also agree with the trial judge's conclusion that when the initiation of repairs does not amount to the commencement of a systematic road project, then the commencement of some such repair efforts along a particular road does not constitute the commencement of repairs as to all sites along the route. The fact that some of the bridges along Bromley Lane had been repaired at the time of the accident does not mean that repairs had commenced as to the Sand Creek site.
 
 
 35
 Nor did the erection of barricades on either side of Sand Creek amount to the commencement of repairs. The witness Steele was asked, "And in your mind, was a barricade serving as a function both to warn people of the bridge being out and also as the stage of road reconstruction that would have to be done later on?" Steele replied, "At the time it was placed, it was for the purpose of protecting the public and to try to shut the road off." There is no evidence in the record that any other activity took place at the site or that the barricades were erected with the intent of initiating construction, reconstruction or repairs. The trial court found that the barriers were set up as warning devices, that their erection was not accompanied by any other activity or any repair efforts on the part of the County, and that, accordingly, the erection of the warning markers did not constitute the initiation of construction, reconstruction or repair. The record supports the finding and we accept it. We further agree with the trial court's determination that the erection of warning signs, without more, does not constitute the initiation of repairs. In this connection, we note that the case cited by appellants for the proposition that the placing of barricades constitutes repair was a case in which the barrier was set up in connection with actual, simultaneous repair work and the issue was not whether the erection of the barricade marked the commencement of repairs but whether the geographical location of the barricade was close enough to the actual repair efforts to be included as a part of those efforts. Lemon v. Commonwealth, 236 Mass. 599, 129 N.E. 382 (1911).
 
 
 36
 In this case, the barriers were set up on May 6, 1973. As of the date of the accident, May 18, 1973, the County had done nothing at that site to make the road passable. Appellants show us no case in which the erection of barricades, without further work or commitment of resources, has been held to constitute the commencement of construction, reconstruction, or repairs. Nor have we been cited any case in which the presence of barriers was held to establish that construction, reconstruction, or repair were in progress. The trial court noted, and we agree, that it is a matter of common knowledge that traffic barriers are frequently stationed at places where no repair work is under way or even contemplated. The placement of barriers alone does not, as a matter of law, amount to the commencement of repairs for the purposes of this endorsement exclusion.
 
 
 37
 Nor does the fact that the necessity of repair was recognized establish that repairs had commenced, for the purposes of the policy endorsement. The witness Steele testified that he knew from the outset that "something would have to be done" about the bridge approaches and that higher officials had held some discussion as to whether the bridge could be rebuilt. But there is no evidence in the record even suggesting that concrete plans had been drawn up or decisions made as to the nature, timing, or logistics of work on the Sand Creek bridge. Appellants have cited us no case for the proposition that discussions about the necessity of repairs or even recognition of a commitment ultimately to undertake repairs constitutes commencement of repairs, particularly for the purposes of an insurance policy which requires that the accident occur during the course of repairs.
 
 
 38
 As a matter of law, no construction, reconstruction or repair, within the meaning of the policy, was commenced by the recognition of the necessity of repair, the discussion of same, the commencement of actual physical repairs at other sites along the road and the erection of warning barricades. The policy endorsement plainly covers only those accidents arising from activities actually directed at on-going construction, reconstruction or repair work at the place where the accident occurs. All of the facts relied upon by appellants taken together do not show that construction, reconstruction or repair were under way at the Sand Creek location.
 
 
 39
 Nor are we persuaded by appellants' argument that the terms "arising from" and "during the course of" are to be liberally construed. The cases cited by appellant liberally construing the term "arising from" are all workmen's compensation cases involving a determination whether a particular injury was sustained in the scope of employment. Appellants have not persuaded us that a liberal interpretation is similarly appropriate as to an insurance contract limiting coverage to construction, reconstruction or repairs or that such interpretation would in any event so expand the definitions of construction, reconstruction or repair as to include the situation at the Sand Creek site. Appellants also cite cases broadly construing what is meant by the phrase "during the course of," but these cases are not relevant here where it has been determined that no construction, reconstruction or repair had even begun.
 
 
 40
 Finally, appellants contend that the policy endorsement is ambiguous and accordingly must be construed against the insurer. The endorsement is not ambiguous and the court is not forced to resort to rules of construction in order to understand it. Given an ordinary and plain reading the policy does not cover this accident.
 
 
 41
 II. Sovereign Immunity.
 
 
 42
 Appellants also argue that even if the insurance policy provides no coverage, the County is still subject to suit because the Colorado statute upon which the County relies for its claim of sovereign immunity is unconstitutional.
 
 
 43
 The Colorado statute, § 24-10-104, set forth above waives sovereign immunity as to insured risks. A following section of the Colorado statutes, § 24-10-106, specifies other situations in which sovereign immunity is waived. Section 24-10-106 provides, in relevant part, as follows:
 
 
 44
 (1) A public entity shall be immune from liability in all claims for injury which are actionable in tort, except as provided otherwise in this section. Sovereign immunity, whether previously available as a defense or not, shall not be asserted by a public entity as a defense in an action for damages for injuries resulting from:
 
 
 45
 (d) A dangerous condition which interferes with the movement of traffic on the traveled portion and shoulders or curbs of any public highway, road, street, or sidewalk within the corporate limits of any municipality, or of any highway which is a part of the federal interstate highway system or the federal primary highway system, or of any paved highway which is a part of the federal secondary highway system, or of any paved highway which is a part of the state highway system or that portion of such highway, road, street, or sidewalk which was designed and intended for public travel or parking thereon. . . .
 
 
 46
 The Colorado Governmental Immunity Act, § 24-10-108, then provides:
 
 
 47
 Except as provided in sections 24-10-104 and 24-10-106, sovereign immunity shall be available to a public entity as a defense to an action for injury.
 
 
 48
 The County argues that county roads are not included among those roads as to which sovereign immunity is waived by § 24-10-106(d) and that, accordingly, in the absence of insurance coverage, sovereign immunity exists as to Bromley Lane, which is a county road.
 
 
 49
 Appellants argue that § 24-10-106(d) is unconstitutional because it infringes the constitutional right to travel and because it violates the equal protection clause. Appellants contend that § 24-10-106 should be "held unconstitutional as applied, and this invalid application should be severed" from the Colorado Governmental Immunity Act. Appellee County argues that even if the severance were granted it would not avail appellants. The County points out that even if § 24-10-106 were struck down in its entirety, the County would have immunity under § 24-10-108, which reserves sovereign immunity except as waived in § 24-10-104 (dealing with the effects of a government entity's securing insurance coverage) and § 24-10-106. The County further points out that even if only subsection (d) is struck from § 24-10-106, the County remains immune as to this accident, because the effect of striking subsection (d) would be, not to extend the waiver of immunity to county roads but, rather, to rescind the waiver as to the roads described in subsection (d).
 
 
 50
 We agree. Even if the section or subsection were declared unconstitutional the County's sovereign immunity here would be unaffected. Section 24-10-108 provides that sovereign immunity is an available defense to public entities sued for injury in Colorado. It is not disputed in this case that the County is a public entity entitled to sovereign immunity. Section 24-10-106 waives sovereign immunity as to certain occasions and causes of injury, but in § 24-10-106 the waived situations are listed as exceptions to the basic rule that "A public entity shall be immune from liability in all claims for injury which are actionable in tort . . .." C.R.S. § 24-10-106. If any particular subsection were removed from the list of exceptions in § 24-10-106, the effect would be to leave sovereign immunity intact as to the occasion or causes of injury enumerated in that subsection. Thus, the excision of § 24-10-106(d) would not extend the waiver of sovereign immunity to this accident. Moreover, even if the entire section were struck down, sovereign immunity would be preserved by virtue of § 24-10-108. The County has sovereign immunity in this action.
 
 
 51
 Thus, the validity of § 24-10-106 is not material to this lawsuit. The only issue before us is whether the County has sovereign immunity. Appellants have not sought declaratory or injunctive relief with respect to the constitutionality of § 24-10-106. Appellants' cross-claims allege only actions in tort and seek only money damages. A determination of the constitutionality of § 24-10-106 is not necessary to a determination whether the County has sovereign immunity as to these tort claims. The County has such immunity, whether § 24-10-106 is constitutional or not. Appellants seek no relief which requires a determination of the section's constitutionality and we do not decide the question.
 
 
 52
 Affirmed.
 
 
 
 *
 Of the Eastern District of Oklahoma sitting by designation